**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------- X
SAGI GENGER,                                                             :
                                                                          :
                                 Plaintiff,                               :      1:14-cv-05683 (KBF)
                                                                          :
                        -against-                                         :
                                                                          :
ORLY GENGER,                                                              :
                                                                          :
                                 Defendant.                               :
------------------------------------------------------------------------- X


**PLAINTIFF SAGI GENGER'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT ORLY GENGER'S MOTION TO DISMISS**

MORGAN, LEWIS & BOCKIUS LLP
John Dellaportas
Nicholas E. Schretzman
Mary C. Pennisi
101 Park Avenue
New York, NY 10178-0060
Tel.:  (212) 309-6000
Fax:  (212) 309-6001

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 3

I.     THE NOV. 10, 2004 INDEMNITY ................................................................. 3

II.    THE FEBRUARY 18 ACTION ........................................................................ 6

III.   SAGI'S RESIDENCE IN CONNECTICUT .................................................... 8

IV.   THE JULY 22, 2014 ORDER CONCERNING SAGI'S DOMICILE............................ 9

V.    THE INSTANT ACTION ............................................................................. 10

ARGUMENT ....................................................................................................... 10

I.     STANDARD ................................................................................................. 10

II.    THE MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
SHOULD BE DENIED IN ITS ENTIRETY ................................................... 11

    A.   Diversity Jurisdiction Exists Because Sagi Was Domiciled in the State of Connecticut
When This Action Was Commenced on July 24, 2014 ................................... 12

    B.   *Res Judicata* Does Not Preclude Sagi's Claims ........................................ 14

III.  THE MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE
12(B)(6) SHOULD BE DENIED IN ITS ENTIRETY ..................................... 16

    A.   The Nov. 10, 2004 Indemnity Does Not Fail for Lack of Consideration ................. 16

        1.   Orly Received a Benefit that Constituted Consideration ........................... 16

        2.   Sagi Suffered a Detriment that Constituted Consideration ....................... 20

        3.   Judicial Estoppel Is Inapplicable Because Sagi Is Not Taking Inconsistent Positions 21

    B.   Sagi Promptly Notified Orly of Dalia's Claim ......................................... 22

    C.   Sagi Has Adequately Pled Promissory Estoppel ....................................... 23

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis,*
   2006 WL 2289847 (S.D.N.Y. Aug. 8, 2006) ........................................................11

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
   464 F.3d 338 (2d Cir. 2006).................................................................10, 11

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)...........................................................................10

*Avne Systems, Ltd. v. Marketsource Corp.,*
   2000 WL 1036035 (S.D.N.Y. 2000)..........................................................24, 25

*Bank of India v. Subramanian,*
   2007 WL 1424668 (S.D.N.Y. May 15, 2007) ...............................................12

*Braddock v. Braddock,*
   60 A.D.3d 84 (1st Dep't 2009) ................................................................24

*Comm. Futures Trading Comm'n v. Walsh,*
   17 N.Y.3d 162 (N.Y. 2011) ....................................................................19

*Comm. Futures Trading Comm'n v. Walsh,*
   2014 WL 847900 (S.D.N.Y. Feb. 28, 2014)................................................19

*Commander Oil Corp. v. Advance Food Serv. Equip.,*
   991 F.2d 49 (2d Cir. 1993)......................................................................17

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.,*
   301 A.D.2d 70 (1st Dep't 2002) ..............................................................23

*Consol. Energy Design Inc. v. Princeton Club of New York,*
   2014 WL 1202946 (S.D.N.Y. March 24, 2014) ........................................24

*Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust,*
   74 A.D.3d 32 (1st Dep't 2010) ...............................................................23

*Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc.,*
   804 F.2d 787 (2d Cir. 1986)....................................................................24

*Global Icons, LLC v. Sillerman,*
   45 A.D.3d 45, 457 (1st Dep't 2007) ........................................................25

*Goad v. United States,*
   46 Fed.Cl. 395 (Fed. Cl. 2000) ...............................................................15

ii

*Hollander v. Lipman*,
   65 A.D.3d 1086 (2d Dep't 2009) ...........................................................21

*Holt v. Feigenbaum*,
   52 N.Y.2d 291 (1981) .........................................................................20

*Katz v. Goodyear Tire & Rubber Co.*,
   737 F.2d 238 (2d Cir.1984)..................................................................13

*Kurz v. United States*,
   156 F. Supp. 99 (S.D.N.Y. 1957), aff'd, 254 F.2d 811 (2d Cir. 1958)...................17

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003)..................................................................11

*Liem v. Ackerman*,
   2012 WL 252120 (S.D.N.Y. Jan. 25, 2012) ...............................................12

*Marshall v. Milberg LLP*,
   2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009) .............................................11

*Meyersohn v. Bloom*,
   259 A.D.2d 432 (1st Dep't 1999) ...........................................................24

*Ministers and Missionaries Benefit Bd. v. Estate of Clark Flesher*,
   2014 WL 1116846 (S.D.N.Y. Mar. 18, 2014) ............................................13

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
   1994 WL 164057 (S.D.N.Y. Apr. 21, 1994)................................................23

*Nat'l Artists Mgmt. Co., Inc. v. Weaving*,
   769 F. Supp. 1224 (S.D.N.Y. 1991).........................................................12

*Nau v. Vulcan Rail & Constr. Co.*,
   286 N.Y. 188 (1944) ...........................................................................17

*Palazzo ex rel. Delmage v. Corio*,
   232 F.3d 38 (2d Cir. 2000)...............................................................12, 13

*Polargrid LLC v. Videsh Sanchar Nigam Ltd.*,
   2006 WL 903184 (S.D.N.Y. 2006).........................................................25

*Ripperger v. A.C. Allyn & Co.*,
   37 F. Supp. 373 (S.D.N.Y. 1940) ...........................................................15

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
   380 F.3d 704 (2d Cir. 2004)..................................................................16

*Sabilia v. Richmond*,
    2011 WL 7091353 (S.D.N.Y. 2011) ................................................................24

*Sun Printing & Publishing Ass'n v. Edwards*,
    194 U.S. 377 (1904) ......................................................................................13

*Techno-TM, LLC v. Fireaway, Inc.*,
    928 F. Supp. 2d 694 (S.D.N.Y. 2013) ............................................................11

*TPR Inv. Associates, Inc. v. Pedowitz & Meister LLP*,
    2014 WL 1979932, at *5 (S.D.N.Y. 2014) ....................................................22

*Weiner v. McGraw-Hill, Inc.*,
    57 N.Y.2d 458, 464-65 (1982) ......................................................................21

*Wiest v. Breslaw*,
    2002 WL 413925 (S.D.N.Y. Mar. 15, 2002) ................................................13

## RULES

Fed. R. Civ. P. 15(a) .................................................................................................30

Fed. R. Civ. P. 12(b)(1) .............................................................................*passim*

Fed. R. Civ. P. 12(b)(6) .............................................................................*passim*

Fed. R. Civ. P. 12(h)(3) .............................................................................*passim*

Fed. R. Civ. P. 8(a)(2) ..............................................................................................10

Individualized Rule 6(c) ...........................................................................................15

## OTHER AUTHORITIES

*Williston, Contracts*, § 863 at 275 (3rd ed. 1970) ...................................................21

Plaintiff Sagi Genger ("Sagi") respectfully submits this memorandum of law in opposition to the motion of defendant Orly Genger ("Orly") to dismiss the complaint (a) under Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction, or (b) under Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

This is a straightforward, breach of contract case.  In 2004, Orly and Sagi promised to financially support their mother, Dalia Genger ("Dalia"), in her retirement, from the valuable economic benefits accrued from shares of stock of Trans-Resources, Inc. ("TRI") that Dalia gave to her children's trusts as part of her divorce from her husband, Arie Genger ("Arie").  Their agreement was later reduced to two written documents.

In 2014, Dalia – financially harmed from all the frivolous lawsuits Orly has filed against her over the years – asked for financial support out of the valuable TRI shares she gave away. Sagi fulfilled his commitment to his mother, but Orly did not.  Instead, she has propped up her lawyers to cry "forgery" on a document she knows full well to be real.

Pursuant to the parties' agreement, Dalia requested $200,000 in financial support from Sagi, which he duly paid.  Then, pursuant to the same overall agreement, Sagi requested 50% ($100,000) from Orly.  She instead repudiated the agreement.

In her Motion to Dismiss, Orly offers a host of baseless technical reasons why the Court should give her a free pass on the contractual commitment she made.  The first of her technical arguments is that the Court lacks jurisdiction, because in an Order dated July 22, 2014 (the "July 22, 2014 Order"), the Court previously dismissed a complaint filed by Sagi – it found that the evidence did not demonstrate that "by February 18, 2014 Connecticut had become his 'true

---

[1]      *See* Defendant Orly Genger's Memorandum of Law in Support of Her Motion to Dismiss, dated August 27, 2014 (Dkt. No 12) (hereinafter, "Motion to Dismiss" or "Mot.").

fixed home' and that he no longer had an 'intention of returning' to New York."[2]  The Court's determination of Sagi's domicile status as of February of 2014 does not preclude diversity jurisdiction here, because Connecticut became Sagi's "true fixed home" by July 24, 2014 when the Complaint in the instant action was filed.  *See* Pennisi Decl., Exh. B.  The Court suggested as much in the July 7, 2014 Order, explaining that it was "unclear where Sagi and Elana lived between the expiration of the lease on the Greenwich Property on December 25, 2013 and the start of their lease term for the New Canaan Property on May 15, 2004."  *Id.*, Exh. A at 5.  Thus, the July 22, 2014 Order has no *res judicata* effect to warrant dismissal.  As set forth below, and in his accompanying supplemental declaration and the exhibits thereto, it is clear that by July 24, 2014, Sagi, his wife and his five children all lived in New Canaan, Connecticut in a residence on a long-term lease and were domiciled in Connecticut.  Indeed, Sagi maintains no New York residence and has not even spent a single night in New York for almost a year.

Next, Orly argues that the Complaint fails to plead a causes of action because:  (1) there was supposedly no consideration for Orly's promise to reimburse Sagi in the Nov. 10, 2004 Indemnity; (2) Sagi is barred from seeking reimbursement because he supposedly failed to promptly notify Orly of Dalia's demand; and (3) Sagi's reliance is unreasonable and he suffered no unconscionable injury to support promissory estoppel.

These arguments are incorrect.  First, Orly obtained ample consideration when she made a mint from her mother's bequest of the TRI shares into the trust for her benefit.  While she has concealed from Sagi the exact amount, Orly sold off her rights to those shares for a personal

---

[2]  *See* Declaration of Mary C. Pennisi, sworn to on September 11, 2014 ("Pennisi Decl." or "Pennisi Declaration"), Exh. A.  The Declaration of David Parnes, executed and filed at 1:14-cv-01006-KBF (Dkt. No. 20) on May 29, 2014, along with the Declaration of Sagi Genger, executed and filed at *id.* (Dkt. No. 23) on May 29, 2014, the Declaration of Dennis Ryan, executed filed at *id.* (Dkt. No. 21) on May 29, 2014, the Declaration of Sagi Genger, executed on June 11, 2014 and filed at *id.* (Dkt. No. 31) on June 13, 2014, and the Declaration of Sagi Genger, executed and filed at *id.* (Dkt. No. 45) on July 7, 2014, are annexed to the Pennisi Declaration filed herein as Exhibits M, N, O, P and Q, respectively.  They are defined herein separately for ease of reference.

payday which almost certainly amounts in the millions of dollars.

Orly demands that the Court ignore her windfall, because, she argues, the Nov. 10, 2004 Indemnity was signed 11 days after her Trust had already received the original consideration, and thus, such consideration cannot form the basis of the Nov. 10, 2004 Indemnity. Under New York law, however, two interrelated agreements are enforceable even when, as here, one of them is signed a few days later the other.

At the end of the day, there remains a clear and unambiguous one-page contract between Sagi and Orly, which was drafted by her own father's lawyer, pursuant to which Orly has a clear duty to reimburse Sagi for one-half of his support of Dalia. The Complaint clearly alleges that the Nov. 30, 2004 Indemnity is a valid and binding contract, that Orly breached and repudiated that contract, and that Sagi has suffered a monetary loss as a result.

## STATEMENT OF FACTS

### I.     THE NOV. 10, 2004 INDEMNITY

In 2004, the Genger family was being torn apart, as Dalia and Arie bitterly negotiated their divorce settlement. *See* Pennisi Decl., Exh. C, Tr. 16:22-17:2 ("My sister was . . . crying hysterically and literally begging my mother to bring this – all this matter to a conclusion. It was very difficult for her, as it was for me."). In order to help resolve his parents' dispute, Sagi, who had been acting as his parents' go-between, brought in attorney David Parnes to advise him on legal issues raised during the course of the divorce. *Id.*, Tr. 49:12-49:22.

One issue holding up the divorce was Dalia's skepticism of Arie's claim that the family's TRI stock holdings had no value. *Id.*, Tr. 16:2-16:6 ("[M]y sister and I were pleading with my mother to sign what substantially was a stipulation of settlement, and she was very doubtful about [Arie's] representations that the TRI shares were worthless."). In 2004, a deal was struck whereby Dalia agreed to convey her marital rights to her 794.40 shares of TRI to two trusts for

the benefit of Sagi and Orly, respectively, with a right to claw back living expenses if those TRI shares produced economic value.  *Id.*, Tr. 23:10-23:13 ("we would give my mother the ability to call back in value . . . her shares that would have been allocated to her").  The parties' oral agreement was thereafter reduced to writing in two related documents:

First, in a co-signed letter dated October 30, 2004 (the "Oct. 30, 2004 Promise"), Sagi agreed to pay Dalia an amount equal to all dividends, distributions, proceeds or other payments attributable to the shares of TRI that were received by Sagi and Orly (or any trust for the benefit of either of them), or any lesser amount, upon demand by Dalia.  *See* Pennisi Decl., Exh. B.  The underlying divorce papers, however, were not delivered to the Court for approval until Orly executed a related document embodying her earlier oral promise to reimburse Sagi for 50% of his support payments to Dalia.  *See* Declaration of David Parnes, sworn to on May 28, 2014 ("Parnes Decl."), Exh. A & ¶ 9.

Second, as she promised to do, Orly executed a co-signed letter dated November 10, 2004 (the "Nov. 10, 2004 Indemnity") agreeing to "indemnify, defend, and hold [Sagi] harmless, for and against one-half . . . of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations . . . , including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings [to Dalia] in the [Oct. 30, 2004 Promise]."  *Id.*, Exh. B & ¶ 9(b).

The parties' agreement was executed in two parts because, on October 30, 2004 – the closing date of Arie's and Dalia's stipulation of settlement (the "Divorce Stipulation") – Orly was on a yacht off the coast of Fiji.  *Id.* ¶ 5; Pennisi Decl., Exh. C, at Tr. 30:8-30:18, 43:18-43:22; Exh. L, at 8-10.  Before leaving for Fiji, however, Orly orally agreed with Sagi to grant Dalia a clawback for living expenses, should the TRI shares generate value – an agreement she then reconfirmed by telephone on October 30, 2004.  *Id.*, Exh. C, at Tr. 29:18-29:21 (Sagi

testified that Orly told him: "if that's what moves the ball forward, it should be done; and that we

should . . . she'd back me, obviously 50-50 on whatever we had to do"); Tr. 32:10-32:12 ("I read

[the Nov. 10, 2004 Indemnity] to her, she said, 'Fine, whatever it is I'll back – backstop you 50-

50.'"); Tr. 99:12-99:16 ("She said to me, 'Obviously whatever you think is correct and that it's

50-50 between us . . . if that's what mom wants and it gets it closed, that's what we'll do.'").

   While Orly was yachting in the Pacific, her father's divorce attorney, Ed Klimerman (a

partner at Sonnenschein Nath & Rosenthal LLP ("Sonnenschein") who also held Orly's power of

attorney on certain matters), was asked to prepare a document reflecting the parties' oral

agreement.  *See* Pennisi Decl., Exh. C, at Tr. 114:16-17, Exh. L, at 4-5; Declaration of Sagi

Genger, executed May 29, 2014 ("May 29 Sagi Decl."), Exh. A, at 7.  On November 10, 2004,

Mr. Klimerman had his assistant, Deborah Kempf, email what was to become the Nov. 10, 2004

Indemnity to Sagi:

> **From:** Kempf, Deborah [mailto:dkempf@sonnenschein.com]
> **Sent:** Wed 11/10/2004 4:27 PM
> **To:** Sgenger@trans-resources.com
> **Cc:** Klimerman, Edward
> **Subject:** FROM: Ed Klimerman
>
> Per your request, attached is a draft of the Indemnity Letter. <<NYCLIB1-17454061-v1-
> Letter from Sagi to Orly.DOC>>

May 29 Sagi Decl., Exh. B.

   When Orly returned to New York, Sagi forwarded to Orly, unchanged, the November 10,

2004 Indemnity prepared by Mr. Klimerman:

> **From:** Sagi Genger
> **Sent:** Wednesday, November 10, 2004 5:51 PM
> **To:** orlygenger@hotmail.com
> **Cc:** dparnes@parnespartners.com
> **Subject:** Loose End from Divorce
>
> Dear Orly,
>
> Since you were in Fiji I promised to mom her full share interest in TRI instead of only
> half.  Please sign the attached to split it with me.

>           If you have any questions you can call David.
>
>           Love,
>
>           Sagi
>           . . . .

Parnes Decl., Exh. C.

Shortly thereafter, Mr. Parnes, Sagi's attorney, made arrangements to pick up a copy of the Nov. 10, 2004 Indemnity Orly had signed.  Orly initially told Mr. Parnes to wait until she consulted with someone.  She later called Mr. Parnes back and told him that she was leaving the signed copy with the doorman at her New York City apartment building.  Mr. Parnes picked up the copy, which he brought to Sagi.  Mr. Parnes watched Sagi sign the document, then added the fully-executed copy to the Genger family's corporate files.  Parnes Decl., ¶ 8.

Almost two years after the Oct. 30, 2004 Promise and Nov. 10, 2004 Indemnity were signed, in October 2006, Sagi contacted Mr. Parnes and asked him where he had placed the November 10, 2004 Indemnity.  Parnes Decl., Exh. D & ¶ 10.  Mr. Parnes directed Sagi to the Genger family corporate files where he had placed the fully-executed copy.  *Id.*  Clearly, the Nov. 10, 2004 Indemnity was not a figment of Sagi's and Mr. Parnes's collective imagination. Indeed, in a February 2014 deposition in another case, Orly was shown a copy of the Nov. 10, 2004 Indemnity.  Orly testified that, while she did not recall the Nov. 30, 2004 Indemnity, the signature on the document appears to be hers.  Pennisi Decl., Exh. D, at Tr. 41:15-45:14 ("It looks like my signature.  But I have absolutely no recollection of signing this document, so I can't say if it is or if it isn't").  To date, Orly has offered no expert opinion to the contrary.

## II.   THE FEBRUARY 18 ACTION

As it turned out, Dalia's skepticism of her husband's veracity was well-placed, and the

TRI shares did produce substantial value.[3]  Meanwhile, Dalia continued to rack up huge legal

fees from her daughter's never-ending lawsuits.  On January 22, 2014, Dalia requested $200,000

from Sagi under the Oct. 30, 2004 Promise.  May 29 Sagi Decl., Exh. D.  The next day, Sagi

notified Orly and her lawyers of Dalia's demand.  *Id.*, ¶ 6.

In response to Dalia's request, Sagi properly paid Dalia $200,000.  Pennisi Decl., Exh. C,

at Tr. 124:23-125-16.  Sagi then requested $100,000 (one-half of the amount paid by Sagi to

Dalia) from Orly under the Nov. 10, 2004 Indemnity.  On February 18, 2014, Sagi commenced

an action for breach of contract against Orly based upon the Nov. 10, 2004 Indemnity.  Pennisi

Decl., Exh. A, at 1; *see also* Pennisi Decl., Exh. S.  This litigation was commenced for the simple

reason that to date, Orly has refused to reimburse Sagi for the $100,000 she owes him under the

Nov. 10, 2004 Indemnity.  *See* May 29 Sagi Decl., Exh. E.

Even though the most Orly would say in her deposition is that she had "no recollection"

of the Nov. 10, 2004 Indemnity, at a conference in the February 18 Action held in April 2014

Orly's counsel told this Court that the Nov. 10, 2004 Indemnity is a "***forgery***."  As noted above,

there is contemporaneous record which proves that a Sonnenschein lawyer drafted the document,

that Sagi provided a copy of it to Orly on November 10, 2004, that she told Mr. Parnes that she

signed it, and that she left a signed copy of the document with her doorman.  By contrast, there is

no evidence that the Nov. 10, 2004 Indemnity is a "forgery."  To remove any shred of doubt,

---

[3]      Specifically, in a post-divorce arbitration, Justice Milonas (Ret.) found that Arie had deliberately
falsified his marital assets by falsely valuing his TRI shares at $0, claiming a corporate liability (the so-
called "Bogalusa liability"), which did not exist.  According to Justice Milonas, Arie's Bogalusa liability
was "significantly misleading, and Arie's exposure, if at all, was minimal. . . . That listing was there for a
reason and it was clearly wrong, and skewed the numbers significantly."  Pennisi Decl., Exh. E, at 8.  By
contrast, he found that the "most credible, reliable and the fairest assessment [of the marital assets in
dispute] was prepared by Sagi."  *Id.*, at 11.  By Arbitration Award dated May 6, 2008, Justice Milonas
awarded Dalia $3.85 million to correct the imbalance in marital assets created by Arie's fabrication.  *Id.*
Sagi's refusal to help his father defraud his mother earned him Arie's enmity, which has manifested itself
in six years of frivolous lawsuits by Orly against her brother, all directed and funded by Arie.  The most
significant of these lawsuits was recently dismissed by Order of the First Department, Appellate Division
entered on July 24, 2014.  *See* Pennisi Decl., Exh. R.

however, Sagi retained a handwriting expert who has compared Orly's signature on the Nov. 10, 2004 Indemnity to over two dozen of Orly's signatures on other documents, and has concluded that "Orly Genger signed her name" to the Nov. 10, 2004 Indemnity.  *See* Declaration of Dennis Ryan, executed May 29, 2014 ("Ryan Decl."), Exh. A.

## III.    SAGI'S RESIDENCE IN CONNECTICUT

Sagi lives in Connecticut, as he did when this Complaint was filed on July 24, 2014.  *See* Supplemental Declaration of Sagi Genger, sworn to on September 11, 2014 ("Supp. Sagi Decl."), ¶¶ 2-3; Declaration of Sagi Genger, sworn to on June 11, 2014 ("June 11 Sagi Decl."), ¶ 2.  Sagi, his wife Elana, and their five children all live full-time at 399 Wahackme Road, New Canaan, Connecticut.  *Id.*, ¶ 3, Exh. C; Supp. Sagi Decl., ¶¶ 2-3.  Sagi has not stayed overnight in the State of New York, even in a hotel, for nearly a year.  Supp. Sagi Decl., ¶ 2.

Over July and August of 2013, Sagi's family moved their residence to Connecticut.  *Id.*, ¶ 4.  His former New York City home is now an investment property leased out through April 30, 2014.  *Id.*, ¶¶ 2-3.  Sagi is employed principally as the President of TPR Investment Associates, Inc. ("TPR"), for which he works from a home office.  On August 2, 2013, TPR registered with the Connecticut Department of State with its principal place of business in Greenwich.  June 11 Sagi Decl., ¶ 5, Exh. G.  On September 27, 2013, Sagi registered his car with the Connecticut Department of Motor Vehicles.  *Id.*, ¶ 5, Exh. H.  On November 6, 2013, he obtained a Connecticut driver's license, and surrendered his New York driver's license.  *Id.*, ¶ 5, Exh. I.

For the 2013-14 and 2014-15 school years, Sagi's four school-aged children are all attending the Bi-Cultural Day School of Stamford, Connecticut, and they are enrolled there for the 2014-2015 school year as well.  June 11 Sagi Decl., ¶ 6, Exhs. J & K; Supp. Sagi Decl., ¶ 3.

Sagi's family endeavors to be religiously observant.  Since last Summer, Sagi's family

8

have been members of the Chabad of Greenwich community.  June 11 Sagi Decl., ¶ 7, Exh. L.
When Sagi's family moved to Connecticut, Rabbi Yisroel Fried of the Chabad of the West Side
of Manhattan assisted Sagi by identifying the parts of his new house to which *mezuzahs* should
be affixed, and the rules governing the removal of the *mezuzahs* from their former home at 1211
Park Avenue.  As it no longer has *mezuzahs* affixed to its doors, that home may no longer serve
as Sagi's residence.  *Id.*, Exh. M.  Sagi attends religious services exclusively in Connecticut.
Supp. Sagi Decl., ¶ 3; *see also id.*, Exh. A.  Moreover, Sagi is registered to vote in Connecticut,
regularly sees a Connecticut-based doctor, and conducts almost all of his non-legal affairs in
Connecticut.  June 11 Sagi Decl.,¶ 3, Exhs. B-C.

Sagi has no plans to move from Connecticut at least until his children's schooling is
complete, which will not be for decades.  *Id.*, ¶ 9; *see also* Supp. Sagi Decl., ¶ 2.  In sum, Sagi's
one and only home, and thus his domicile, is in Connecticut, and was so on July 24, 2014.

## IV. THE JULY 22, 2014 ORDER CONCERNING SAGI'S DOMICILE

Orly moved to dismiss the February 18 Action under Federal Rule of Civil Procedure
12(b)(6) on May 21, 2014, and then moved to dismiss for lack of subject matter jurisdiction
under Federal Rule of Civil Procedure 12(b)(1).  Pennisi Decl., Exh. A.  On July 22, 2014, this
Court dismissed the case for lack of jurisdictional grounds because "Sagi ha[d] failed to prove by
clear and convincing evidence both, that by February 18, 2014, Connecticut had become his 'true
fixed home' and that he no longer had an 'intention of returning' to New York."  *Id.*, at 11.

The Court noted the evidence of Sagi's residence in Connecticut, including "(1) his leases
of property in Connecticut; (2) his use of a Connecticut address for his business; (3) his
membership in Chabad of Greenwich; (4) his children's attendance at a school in Connecticut;
(4) his Connecticut driver's license and vehicle registration."  Pennisi Decl., Exh. A.. at 9-10.
However, the Court held that Sagi's domicile remained in New York **as of February 18, 2014**

because:  (1) there was "no documentary evidence that Sagi was renting a property in Connecticut" on February 18, 2014; (2) the evidence indicated the *mezuzahs* were removed from his door by June 11, 2014, (3) as of February 18, 2014; "Sagi continued to use the New York Apartment's address for several months after" February 18, 2014; and (4) Sagi and his wife Elana "did not have tenants living in the New York Apartment until May 1, 2014."  *Id.*, at 10-11. The Court indicated that the evidence that Sagi's domicile was currently Connecticut post-dated his filing of the February 18 Complaint, and dismissed the action without prejudice accordingly.

## V.     THE INSTANT ACTION

Because Connecticut was Sagi's domicile as of July of 2014, Sagi filed the Complaint in the instant action based upon diversity jurisdiction on July 24, 2014.  *See* Pennisi Decl., Exh. B. Sagi submits that the jurisdictional defect has now been cured.  As Orly has raised no other valid argument to dismiss the Complaint, the motion should be denied *en toto*.

## ARGUMENT

## I.     STANDARD

Under Federal Rule of Civil Procedure (hereinafter "Rule") 8(a)(2), a complaint only requires "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" There is a presumption of an entitlement to relief if a complaint is facially plausible and the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678 (2009).  In the Second Circuit, "[*a*]*ll* complaints must be read liberally," and courts should "draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct." *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir. 2006).  In a motion to dismiss under Rule 12(b)(6), the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor

of the plaintiff." *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, 2006 WL 2289847, at *10 (S.D.N.Y. Aug. 8, 2006)).  The Second Circuit has held that: "dismissal on the pleadings *never* is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Amron*, 464 F.3d at 343 (emphasis in original).  The standard of review for a motion under Rule 12(b)(1) is "substantively identical" to the standard for a motion under Rule 12(b)(6).  *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).  Although the burden remains on the party asserting jurisdiction, the Court "accept[s] all factual allegations in the complaint as true and draw[s] inferences from those allegations in the light most favorable to the plaintiff." *Marshall v. Milberg LLP*, 2009 WL 5177975, at *2 (S.D.N.Y. Dec. 23, 2009).  Diversity jurisdiction requires that "'all adverse parties to a litigation are completely diverse in their citizenships.'" *Techno-TM, LLC v. Fireaway, Inc.*, 928 F. Supp. 2d 694, 695 (S.D.N.Y. 2013) (quotation omitted).

  As set forth herein, at the time this case was commenced on July 24 2014, and continuing through to this day, Sagi is a domiciliary of Connecticut, Orly is a domiciliary of New York, and diversity exists.  Furthermore, Sagi has adequately pled two cognizable legal theories of breach of contract and promissory estoppel that would render dismissal improper under Rule 12(b)(6).

## II.  THE MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION SHOULD BE DENIED IN ITS ENTIRETY

  Orly urges dismissal under Rules 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction.  *See* Mot. 10-12.  She assumes that the July 22, 2014 Order holding that Sagi was not a domiciliary of Connecticut on February 18, 2014 somehow destroys diversity jurisdiction in the instant action commenced nearly six months later on July 24 2014.  As follows, this misguided assumption is contradicted by ample evidence to the contrary (and detailed in the

July 22, 2014 Order itself), showing that Sagi became a Connecticut domiciliary after February 8, 2014 (and before this action was commenced on July 24, 2014).

A.     **Diversity Jurisdiction Exists Because Sagi Was Domiciled in the State of Connecticut When This Action Was Commenced on July 24, 2014**

Dismissal under Rules 12(b)(1) or 12(h)(3) for lack of diversity jurisdiction would be improper because "[i]t is well settled that diversity, and in turn domicile, is assessed <u>as of the time an action is commenced</u>." *Liem v. Ackerman*, 2012 WL 252120, at *1 (S.D.N.Y. Jan. 25, 2012) (emphasis added); *see also Bank of India v. Subramanian*, 2007 WL 1424668, at *3 (S.D.N.Y. May 15, 2007) (citation omitted).  An individual is a citizen in the state in which he is domiciled, and an individual's domicile is "'the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'" *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000) (citation omitted).  Courts consider several factors to determine the domicile of an individual, including, *inter alia*:

- Location of Current Residence;

- Locations of Real and Personal Property;

- Location of Spouse and Family;

- Location of Driver's License;

- Location of Automobile Registration;

- Location of Membership in Organizations;

- Location of Places of Employment or Business; and

- Individual's Statements of Intent.

*See Subramanian*, 2007 WL 1424668, at *3; *Nat'l Artists Mgmt. Co., Inc. v. Weaving*, 769 F. Supp. 1224, 1227-28 (S.D.N.Y. 1991).

Here, Sagi submits that he changed his domicile from New York to Connecticut.  Pennisi Decl., Exh. B, at 9-10.  "To effect a change of domicile, 'two things are indispensable:  First,

residence in a new domicile; and second, the intention to remain there." *Palazzo ex rel.*

*Delmage,* 232 F.3d at 42 (citing *Sun Printing & Publishing Ass'n v. Edwards*, 194 U.S. 377, 383

(1904)).  "A party alleging that there has been a change of domicile has the burden of proving

the 'required . . . intent to give up the old and take up the new [domicile], . . . 'and must prove

those facts by clear and convincing evidence.'" *Id*. (quoting *Katz v. Goodyear Tire & Rubber*

*Co.*, 737 F.2d 238, 243-44 (2d Cir. 1984)).

Courts have found that a party has met such a burden where the evidence shows that the

party "physically moved [to the new state] . . . with nearly all of his possessions and intended to

stay there." *See Ministers and Missionaries Benefit Bd. v. Estate of Clark Flesher*, 2014 WL

1116846, at *6 (S.D.N.Y. Mar. 18, 2014).  For instance, in *Wiest v. Breslaw*, 2002 WL 413925,

at **3-4, 5 (S.D.N.Y. Mar. 15, 2002), a party adequately showed that his domicile changed from

New York to Florida where he presented evidence that, as of the commencement of the action,

he (a) resided in a Miami Beach apartment, (b) recently terminated a lease he held for an

apartment in New York City because his business there was "winding down," and (c) stated that

he intended to continue to reside in Florida and expressed his preference for the healthier

lifestyle of the state as compared to New York.  *Id.*  The Court found that this evidence was

sufficiently clear and convincing to outweigh other evidence that the party was still domiciled in

New York, including that (a) he previously declared himself to be a "single man of the County of

Manhattan," (b) his only active business was in New York, (c) his credit cards were registered in

New York, and (d) his long-term domestic partner, primary physician, attorney, and his only

leased residence were all in New York.  *Id.*  The court considered the party's intent to be critical

and gleaned his intent from his sworn testimony that he considered Florida to be his domicile,

having chosen it for the healthier lifestyle.  *Id.*

Likewise, here, pursuant to the above factors, Sagi is now a domiciliary of Connecticut.

Sagi has not spent a single night in New York in almost a year, not even in a hotel.  *See* Supp.
Sagi Decl., ¶ 2.  Sagi has provided evidence that by July 24, 2014, he:  (1) lived in Connecticut
with his wife and five children, in a home with a long-term lease; (2) worked for TPR (a
company based in Connecticut) from his home office; (3) registered his car with the Connecticut
Department of Motor Vehicles; (4) obtained a Connecticut driver's license and surrendered his
New York driver's license; (5) enrolled each of four children at the Bi-Cultural Day School of
Stamford, Connecticut, for the 2013-14 and 2014-15 school years; (6) is a member of the Chabad
of Greenwich, Connecticut; (7) has properly affixed *mezzuzahs* to his Connecticut house and
removed them from his former New York home; (8) receives mail in Connecticut; (9) pays all
his utilities in Connecticut; and (10) intends to remain in Connecticut indefinitely.  *See supra*,
Statement of Facts III *supra*; *see also* July 7 Sagi Decl., *passim*; Supp. Sagi Decl.

Furthermore, Sagi has signed a long-term lease on his property in Connecticut, and has
leased out his former New York home for the next two years.  As the Court noted in its July 22,
2014 Order, "the start of [Sagi's] lease term for the New Canaan Property on May 15, 2004,"
Pennisi Decl., Exh. A at 5, "the *mezzuzahs* were removed from his door by June 11, 2014, Sagi
arranged for tenants to live in the New York Apartment by May 1, 2014," *id*. 10-11.  In short,
Sagi has now met his burden to establish diversity jurisdiction.

**B.**     ***Res Judicata* Does Not Preclude Sagi's Claims**

Orly claims that the Court "already has dismissed the near-identical complaint once,"
based on lack of subject matter jurisdiction, after concluding that Sagi did not provide that "'**by
February 18, 2014** Connecticut had become his 'true fixed home' and that he no longer had an
'intention of returning to New York.'"  Mot. at 11 (emphasis added).  She acknowledges "that
the dismissal was without prejudice," but maintains that "*res judicata* compels dismissal of the

instant action in this Court." *Id.*[4]

> Under the doctrine of *res judicata*:
>
> While a dismissal of an action on the sole ground that the court has no jurisdiction of the subject matter or of the parties is a conclusive determination of the fact that the court lacks jurisdiction, it is not an adjudication of the merits and will not bar another action in the proper tribunal for the same cause; **nor will it bar a second suit where the pleader in the prior suit failed to allege some essential jurisdictional fact which later is supplied in a new pleading**. . . . It is quite true that if a suit be dismissed solely for lack of jurisdiction because there is no diversity of citizenship between plaintiff and defendant, that **plaintiff may bring suit on the same cause of action in the same district if he subsequently becomes a citizen of another state**, so that diversity of citizenship then exists between plaintiff and defendant; and the dismissal of the first suit is not a bar to the second in the same court.

*Ripperger v. A.C. Allyn & Co.*, 37 F. Supp. 373, 374 (S.D.N.Y. 1940) (emphases added); *see also Goad v. United States*, 46 Fed. Cl. 395, 398 (Fed. Cl. 2000) ("[I]f [a] second-filed claim contains new information which cures the jurisdictional defect fatal to the first-filed suit, then the second-filed suit presents a different jurisdictional issue and res judicata does not apply.").

Here, in the July 22, 2014 Order, the Court referenced ample evidence presented by Sagi that Connecticut became his home, but post-dated the filing date of the February 18 Action. All of that evidence pre-dates the July 24, 2014 filing date herein and provides the requisite clear and convincing evidence, as explained above. Therefore, the July 22, 2014 Order has no preclusive effect to warrant dismissal of the instant action, because it only determined jurisdiction applicable to the former February filing date, whereas the evidence presented in that case, along with the additional evidence submitted herein, provides the requisite clear and convincing evidence that Connecticut is Sagi's domicile as of July 24, 2014.

---

[4]   Orly also claims that Sagi "has not complied with Rule 6(c) of this Court's Individual Rules of Practice requiring that Sagi 'submit to the Court a letter not exceeding two (2) single-spaced pages (exclusive of letterhead and signature block(s)) explaining the basis of [Sagi's] belief that diversity jurisdiction exists.'" Mot. at 11-12. However, Rule 6(c) only requires such a letter after the initial pre-trial conference, which has not yet occurred in this case.

## III.   THE MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6) SHOULD BE DENIED IN ITS ENTIRETY

### A.   The Nov. 10, 2004 Indemnity Does Not Fail for Lack of Consideration

Orly maintains that the Nov. 10, 2004 Indemnity fails for lack of consideration.  Mot. at 13.  There is no basis in law or in fact that such consideration is lacking.

#### 1.   Orly Received a Benefit that Constituted Consideration

<u>First</u>, Orly argues that Sagi "had neither the power nor ability to provide to Orly any of the purported consideration which he contends supports the [Nov. 10, 2004 Indemnity]."  Mot. at 14.  What matters is whether Orly received a benefit in the overall agreement reached by Dalia, Sagi, and Orly.  In consideration for Orly's promise to reimburse Sagi for 50% of monies paid to Dalia under the Oct. 30, 2004 Promise, Orly received an economic benefit from her mother's marital rights in the TRI shares.  Orly also received an emotional and psychological benefit in helping to bring about an end her parents' bitter divorce battle.

Orly clearly agreed to reimburse Sagi in exchange for receiving these two real benefits.  Under New York law, that is more than sufficient consideration for an enforceable agreement.  *See, e.g.*, *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 709 (2d Cir. 2004) ("So long as a contract provides some consideration, it may be minimal – even a peppercorn . . . Courts do not inquire into the value or adequacy of the consideration.").

<u>Second</u>, Orly argues that, because the Divorce Stipulation was signed "as of October 26, 2004," the shares of TRI received by Orly in connection with the divorce "could not be consideration for Orly's purported acceptance of an indemnification obligation on November 10, 2004."  Mot. at 14.  In other words, according to Orly, there was no consideration because the divorce had already occurred, and the economic benefit already conveyed, by the time that Orly signed the Nov. 10, 2004 Indemnity.  *Id.*

Orly's argument is legally flawed and factually disingenuous.  Dalia obtained her rights under the Oct. 30, 2004 Promise – specifically, her contractual right to claw back the economic value attributable to the TRI shares she gave up – as a condition to signing the divorce papers, relinquishing her right to the TRI shares, and ending a protracted family battle.  On October 30, 2004, the closing date for the divorce, Orly was vacationing off the coast of Fiji.  Prior to her departure, Orly agreed with Sagi to split any monies paid to Dalia under the "clawback," but Sagi assumed the entire obligation to Dalia under the Oct. 30, 2004 Promise so that the closing could be completed without Orly present.  Sagi only did so, however, because Orly had agreed to reimburse him for 50% of any monies paid to Dalia.  Sagi signed the Oct. 30, 2004 Promise with Dalia and then, when Orly returned to New York, she executed the Nov. 10, 2004 Indemnity to memorialize her prior oral agreement with Sagi.

Under New York law, because the Oct. 30, 2004 Promise and the Nov. 10, 2004 Indemnity are interrelated (indeed, the latter attaches and cross-references the former), the Nov. 10, 2004 Indemnity does <u>not</u> fail for lack of consideration just because it was signed after the Divorce Stipulation.  *See, e.g.*, *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49 (2d Cir. 1993) ("Even if the writings are executed at different times, . . . contracts should be interpreted together if 'the parties assented to all the promises as a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'") (quoting Williston, *Contracts*, § 863 at 275 (3rd ed. 1970)); *Kurz v. United States*, 156 F. Supp. 99, 104 (S.D.N.Y. 1957)), *aff'd*, 254 F.2d 811 (2d Cir. 1958)  (New York law is flexible on "time lapse between instruments" because "where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together, even though they do not expressly refer to each other"); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941) (where contracts "were executed at substantially the same time, [and] related to the same subject

17

matter, [they] were contemporaneous writings and must be read together as one").

<u>Third</u>, Orly argues that the "Entire Understanding Clause" contained in the Divorce Stipulation, an integration clause, precludes any "side agreement."  Mot. at 6.  Orly's argument is contradicted by that clause's plain language, which provides:

> This Agreement contains the entire understanding ***of the parties*** who hereby acknowledge that between them there have been and are no representations, warranties, covenants or undertakings (whether written or oral, express or implied) with respect to the subject matter hereof including, without limitation, all rights or claims arising at law, in equity or pursuant to the parties' marital relationship ***other than those expressly set forth herein or in the transaction contemplated hereby or entered into concurrently herewith***.

Pennisi Decl., Exh. T (Divorce Stipulation, Art. XXI) (emphases added).  The integration clause states that the Divorce Stipulation "contains the entire understanding ***of the parties***."  *Id.*  Only Arie and Dalia are "parties" to the Divorce Stipulation.  Sagi and Orly are not.  Indeed, the Divorce Stipulation provides that "no third person shall be deemed to have been given any interest or right hereunder."  *Id.*, Art. XIX(4).  Further, the "Entire Understanding" clause contains a carve-out for agreements like the Oct. 30, 2004 Promise and Nov. 10, 2004 Indemnity that were, as explained above, "entered into concurrently" with the Divorce Stipulation.  *See id.* (entire understanding of Arie and Dalia "other than those expressly set forth herein or in the transaction contemplated hereby or entered into concurrently herewith.").

<u>Fourth</u>, Orly argues that a mutual release in the Divorce Stipulation precludes this action.  Mot. at 15.  This argument is contradicted by the mutual release's plain language, providing:

> The Wife hereby remises, releases and forever discharges the Husband, the Husband's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, sums of money . . . which the [Wife], the [Wife's] heirs, executors, administrators, successors and assigns ever had or now has ***against the [Husband]*** . . . .

Pennisi Decl., Exh. T (Divorce Stipulation, Art. IX(2), at 34) (emphasis added).  In other words, Dalia released Arie and Arie's heirs from claims Dalia and Dalia's heirs had ***against Arie*** and

Arie alone, not against anyone else.  *Id.*  As Sagi was not a party to the Divorce Stipulation, he

did not, and could not, release any claims that he may have had in 2004, let alone today.  Even

assuming *arguendo* that Sagi somehow released claims in a Divorce Stipulation to which he was

not even a party (and he did not), the only claims that were released were claims ***against Arie***,

not against Orly.

Fifth, Orly argues that her "supposed desire to see the divorce case end" is nothing more

than "the love children have for their parents," and thus is insufficient under New York law.

Mot. at 15.  As Orly does not deny that value stemming from the TRI shares constitutes valuable

consideration, this is beside the point.  However, even had Orly not received an economic benefit

from those shares, that would not make the transaction consideration-less.

As the testimony establishes, the Gengers' divorce was tearing the family apart.  Thus,

for everyone's emotional well-being (on top of the financial benefit of the TRI shares), Orly

agreed to the clawback in order to end her parents' protracted divorce battle.  *See* Pennisi Decl.,

Exh. D, at Tr. 39:11-39:19 ("I definitely had a desire for the divorce to be over with . . .

[b]ecause it was a horrible period.").  According to Orly, her desire to put an end to the divorce is

not valid consideration because she received nothing tangible from it other than "love and

affection."  New York law, however, "recognizes other forms of legitimate consideration,

including non-monetary consideration."  *Comm. Futures Trading Comm'n v. Walsh*, 17 N.Y.3d

162, 175-76 (2011) (listing examples of non-economic consideration); *see also Comm. Futures

Trading Comm'n v. Walsh*, 2014 WL 847900, at *5 (S.D.N.Y. Feb. 28, 2014) (supporting and

raising children is valid and valuable consideration).  In any event, Orly did not agree to the deal

for her brother's love, but rather for her own "desire" to end "a horrible period."  For that very

reason, Orly's "love and affection" cases are inapposite.

Orly also falsely suggests to this Court that she has been "pauperized," Mot. at 21,

19

leaving no hint that Orly got rich from her mother's grant of the TRI shares; but in fact, she did. While her exact take is not yet known (Sagi is pursuing discovery on this point, *see* Pennisi Decl., Exh. U), this much is clear.  In 2010, Orly brought a lawsuit against, among others, her father's former business partners (the "Trump Group") claiming they had wrongfully deprived her trust of the economic benefit of the TRI shares Dalia had transferred to her.  Supplemental Declaration of Mary C. Pennisi, sworn to September 11, 2014 ("Supp. Pennisi Decl."), Exh. X. In July 2013, Orly settled with the Trump Group, agreeing to "cooperate" and "cause" her trust to release its TRI-related claims against the Trump Group.  *Id.*, Exh. Y, at 4.  Orly then had her counsel write the Delaware Court, where her trust was suing the Trump Group over the same shares, "acknowledg[ing] individually and in her capacity as the beneficiary of her trust that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust."  Pennisi Decl., Exh. V.  Satisfied that Orly no longer wanted her trust to pursue ownership over the TRI Shares, the Delaware Court dismissed her trust's claims with prejudice.  Supp. Pennisi Decl., Exh. AA.  In short, Orly sold her economic rights to the TRI shares that her mother gave her in 2004.  While Orly will not reveal the sale price, her own attorney and one for the Trump Group have stated that Orly was paid cash.  Pennisi Decl., ¶¶ 23-24, Exhs. W, V.  For Orly to now claim that she received no consideration, when she likely got millions of dollars, is misleading at best.

### 2.     Sagi Suffered a Detriment that Constituted Consideration

Aside from the rich benefit Orly received, the detriment that Sagi suffered under the Nov. 10, 2014 Indemnity provided consideration to support it.  As explained by the Court of Appeals in *Holt v. Feigenbaum*, 52 N.Y.2d 291, 296-300 (1981), the "[d]ual notion of consideration as either a benefit to the promisor *or* a detriment to the promisee has persisted

[from seventeenth century English common law in *Slade's Case* . . .] to the present day and has

become an integral part of our modern approach to the enforceability of contracts."  It added:

> Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee. Thus, courts have not hesitated to find sufficient consideration not only in what is now the proverbial peppercorn . . ., but in 'a horse or a canary, or a tomtit if [the promisee] chose' . . . In fact, the detriment suffered or the thing promised need be of no benefit to the one who agreed to it.

*Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464-65 (1982); *see also Hollander v. Lipman*, 65

A.D.3d 1086, 1087 (2d Dep't 2009) ("[f]ind[ing] that the Supreme Court erred in concluding, as

a matter of law, that the alleged April 1995 oral agreement between the defendant's decedent . . .

and his late daughter was not supported by consideration because it did not benefit the decedent

[because] [t]he fact that the decedent's daughter agreed to suffer a detriment provided sufficient

consideration to support the alleged agreement.").

Here, there was a personal promise by Orly to reimburse Sagi for 50% of their mother's

support, which – legalities aside – Sagi reasonably relied upon (given that it was coming from

his own sister), and from which he suffered a detriment thereunder.  It would be unconscionable

to force Sagi to support their mother on his own, when they both made a commitment to equally

do so, and when the reason that Dalia seeks the financial support is because Orly has depleted

her resources through endless, meritless lawsuits.

### 3.    Judicial Estoppel Is Inapplicable Because Sagi Is Not Taking Inconsistent Positions

Orly claims that the "doctrines of judicial estoppel and estoppel against inconsistent

positions" apply and prohibit Sagi's claim that Orly received "shares of TRI" in connection with

the divorce, because he has successfully claimed in other courts that "the TRI Shares are not, and

have never been an actual asset of the Orly Trust."  Mot. at 16-18.  As noted above, TPR has

21

raised that contention because Orly settled and sold her rights to those shares, and so can no longer lay claim to them.  U.S. District Judge Keenan has agreed.  *TPR Inv. Associates, Inc. v. Pedowitz & Meister LLP*, 2014 WL 1979932, at *5 (S.D.N.Y. 2014) ("The beneficial ownership issue is now dead; Orly has settled with the Trump Group.").

    **B.**    **Sagi Promptly Notified Orly of Dalia's Claim**

    Orly also argues that Sagi cannot seek indemnification under the Nov. 10, 2004 Indemnity because Sagi failed to notify Orly of their mother's claim for money under the Oct. 30, 2004 Promise, and thus, failed to provide Orly an opportunity to defend against the claim.  Mot at 18-19.  Because Sagi, in reality, promptly notified Orly of Dalia's demand, there is no basis in law or in fact for Orly to escape her contractual obligations on this ground.

    <u>First</u>, Orly falsely asserts that Sagi "only demanded that $100,000 from Orly on February 17, 2014, which was <u>after</u> Sagi paid Dalia $200,000 in response to Dalia's demand." Mot. at 19.  This is untrue, and Orly and her counsel plainly know it to be untrue.  In truth, Sagi <u>immediately</u> informed Orly about Dali's demand.  Here is the relevant timeline:

- <u>January 22, 2014</u> – Dalia submitted a demand to Sagi for $200,000. May 29 Sagi Decl., Exh. D.

- <u>January 23, 2014</u> – Sagi's provided oral notice of Dalia's demand to Orly and her lawyers in a face-to-face meeting.  *Id.*, ¶ 6.

- <u>January 24, 2014</u> – Orly's counsel, Lance G. Harris, Esq., sent an email referencing that notice, and requested a written copy of Dalia's demand:

  > Clearly, the newly provided documents [*i.e.*, the Oct. 30, 2004 Promise and the Nov. 10, 2004 Indemnity] require review and consideration on our part. To that end - can you provide me with original of the documents provided and a copy of the Dalia demand under the "promise." (Pennisi Decl., Exh. H).

- <u>January 29, 2014</u> – Orly's counsel of record in this case once again acknowledged Sagi's notice to Orly of Dalia's demand under the Nov. 10, 2004 Indemnity:

  > We intend to ask questions about the "promise" documents [*i.e.*, the Oct. 30, 2004 Promise and the Nov. 10, 2004 Indemnity] when Sagi is deposed on Monday, Feb. 3.  . . . They should probably have been produced to all sides in discovery --- <u>along with Dalia's apparent recent demand for</u>

22

lifestyle funds.  (*Id.*, Exh. I) (emphasis added).

In any event, under the case Orly cites, *Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust*, 74 A.D.3d 32 (1st Dep't 2010), no such notice is required where, as here, the indemnitee can "establish that [it] would have been liable and that there was no good defense to the liability."  *Id.* at 39 (citation omitted).  There is no viable defense that Sagi could truthfully have asserted to Dalia's payment demand.  Neither Sagi nor Dalia is feigning amnesia, or crying "forgery," or pretending there is no consideration.

Further, the Nov. 10, 2004 Indemnity is not a traditional indemnity obligation, like an insurance contract, pursuant to which Orly agreed to cover a particular type of claim.  *See, e.g., Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 1994 WL 164057, at *2 (S.D.N.Y. Apr. 21, 1994) (traditional indemnification is where "the party seeking indemnification [seeks] it for amounts paid in settlement of a legal claim asserted by a third party").  The Nov. 10, 2004 Indemnity is basically a contribution obligation – a duty to reimburse Sagi for 50% of any amount that Sagi paid to Dalia in accordance with the Oct. 30, 2004 Promise.  Thus, the cases Orly relies upon – holding that an indemnitor has no contractual duty to indemnify without first receiving notice and a chance to defend – are inapplicable.  Mot. at 18-19 (citing cases).

Lastly, even assuming *arguendo* that the Nov. 10, 2004 Indemnity grants Orly a right to defend any claim made by Dalia under the Oct. 30, 2004 Promise (and it does not), Orly still repudiated her Nov. 10, 2004 Indemnity on February 18, 2004 when, in reply to Sagi's follow-up request for reimbursement, she emailed him back telling him to "stop lying about me and about the history."  May 29 Sagi Decl., Exh. E.  Under New York law, one cannot repudiate a contract and then simultaneously claim a right to defend under it.  *See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 79 (1st Dep't 2002) (a party who repudiates a contract cannot claim right to enforce thereunder).  Accordingly, Orly has forfeited any right she may

23

have otherwise had to invoke its provisions for her personal benefit.

**C.     Sagi Has Adequately Pled Promissory Estoppel**

Finally, Orly claims that Sagi's claim for promissory estoppel is "irreparably flawed as a matter of law and should be dismissed."  Mot. at 20.  However, she ignores that  "[t]o sustain this claim, plaintiff must establish 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'"  *See, e.g.*, *Avne Sys., Ltd. v. Marketsource Corp*., 2000 WL 1036035, at *1 (S.D.N.Y. 2000) (quoting *Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir. 1986)).

Here, Sagi has pled all of these elements.  The Complaint bases the Second Cause of Action on a personal promise by Orly to reimburse Sagi for 50% of their mother's support, which – legalities aside – Sagi reasonably relied upon, given that it was coming from his own sister.  It would be an unconscionable injury to Sagi to force him to support their mother on his own, when they both made a commitment to do so, and when the reason his mother seeks the financial support is because Orly has depleted her resources through meritless lawsuits.  The facts satisfy of the elements of promissory estoppel.  *See, e.g.*, *Meyersohn v. Bloom*, 259 A.D.2d 432, 433-44 (1st Dep't 1999) ("[C]orrespondence between the parties evidenced a clear personal promise by defendant to repay the amount in dispute, and plaintiffs relied on the promise"); *accord, e.g.*, *Consol. Energy Design Inc. v. Princeton Club of New York*, 2014 WL 1202946, at *3 (S.D.N.Y. March 24, 2014); *Sabilia*, 2011 WL 7091353, at *28.

Orly claims that "[n]either Sagi nor Dalia can reasonably rely on a 2004 promise based on the purported transfer of TRI shares." Mot. at 20.  However, courts have found that reliance on promises made by family members were reasonable.  *See Braddock v. Braddock*, 60 A.D.3d 84, 95 (1st Dep't 2009) ("Not only are the allegations sufficient to permit John's claim of fraud

to proceed; they also are sufficient to make out the elements of a claim for promissory estoppel—'a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise.'") (citations omitted).  Moreover, reliance on a promise is a fact issue inappropriate for a motion to dismiss. *See Global Icons, LLC v. Sillerman*, 45 A.D.3d 45, 457 (1st Dep't 2007).

Orly then conclusorily asserts that "any injury to Sagi is not unconscionable." Mot. at 22. This, too, is a fact allegation ill-suited for a motion to dismiss.  Further, it overlooks that "unconscionable injury has only been required when the theory of promissory estoppel is invoked to avoid the statute of frauds."  *Polargrid LLC v. Videsh Sanchar Nigam Ltd*., 2006 WL 903184, at *3 (S.D.N.Y. Apr. 7, 2006) (citation omitted) (unconscionability required only when promissory estoppel asserted to contravene Statute of Frauds); *Rosenthal v. Kingsley,* 674 F. Supp. 1113, 1125 (S.D.N.Y. 1987); *Sabilia*, 2011 WL 7091353, at *27.  The statute of frauds is not at issue in this case, since the Nov. 10, 2004 Indemnity is in writing.  Accordingly, "the element of unconscionable injury need not be alleged."  *Polargrid LLC*, 2006 WL 903184, at *3. Nevertheless, Sagi has suffered an unconscionable injury in the form of a burden to financially support Dalia alone.

Therefore, Orly fails to satisfy her burden of showing that the Second Cause of Action should be dismissed under Rule 12(b)(6).  It is instead properly pled as an alternative theory to breach of contract.  *See Avne Sys., Ltd.*, 2000 WL 1036035, at *1.

## CONCLUSION

Nearly ten years ago, Orly made a commitment to help support her mother Dalia in her retirement.  Unfortunately, Orly and her mother are now estranged, and Orly no longer wishes to honor her commitment.  It is regrettable that Orly has chosen this course.  Regardless, her latest dismissal motion is without merit and should be denied in its entirety.

Dated:       New York, New York
               September 11, 2014

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP


By:        */s/ John Dellaportas*
    John Dellaportas
    Nicholas E. Schretzman
    Mary C. Pennisi
    101 Park Avenue
    New York, New York 10178
    *Attorneys for Plaintiff Sagi Genger*