UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAGI GENGER, | Civ. No.:  14-5683 (KBF) |
| Plaintiff, | |
| - against - | **DEFENDANT ORLY GENGER'S STATEMENT OF MATERIAL UNDISPUTED FACTS** |
| ORLY GENGER, | |
| Defendant. | |

Pursuant to Local Rule 56.1, defendant Orly Genger ("Orly") respectfully submits her Statement of Undisputed Material Facts in support of her summary judgment motion, asking this Court to dismiss plaintiff Sagi Genger's ("Sagi") complaint (the "Operative Complaint") with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

A.      **The Parties**

1.      Orly is an accomplished artist.  <u>See</u> Various Published Reviews; Sagi 8/25/10 Ver. Answer ¶ 15 (Leinbach Decl., Exs. 3, 5).

2.      In 2004, Orly had little schooling or experience in business or finance. Orly 1/15/08 Ver. Compl. ¶ 1 (Leinbach Decl., Ex. 7).[1]   Rather, Orly reposed her trust, confidence and reliance in her older brother, Sagi, who often provided business advice to her. <u>Id.</u>; Sagi 7/26/12 Dep. Tr. at 408:18-25, 468:8-470:15 (Leinbach Decl., Ex. 9).

---

[1]  Pursuant to New York Civil Practice Law and Rules § 105(u), a verified pleading is treated as a sworn affidavit under New York law.

3.      Sagi is Orly's older brother.  Orly 1/15/08 Ver. Compl. ¶ 2; Sagi 2/22/08 Ver. Answer ¶ 2 (Leinbach Decl. Exs. 7, 8).  Sagi holds an MBA in finance from The Wharton School, and has years of practical experience as a businessman.  Orly 1/15/08 Ver. Compl. ¶ 2; Sagi 2/22/08 Ver. Answer ¶ 2.

4.      Sagi is currently the President and/or CEO of TPR Investment Associates, Inc., a closely held company founded by Sagi and Orly's father, Arie Genger ("Arie").  TPR Shareholders Agreement, Section 2.2; Sagi 8/25/10 Ver. Answer ¶ 9 (Leinbach Decl., Exs. 10, 5).[2]  The Sagi Trust (whose beneficiary is Sagi) is majority owner of TPR.  Sagi 1/16/14 Dep. Tr. at 234:17-19 (Leinbach Decl., Ex. 14).  See also TRI Investors, LLC v. Genger, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010) (finding that "Sagi Genger controlled [TPR] by 2008.")

5.      Dalia Genger ("Dalia") is Sagi and Orly's mother.  Orly 8/4/10 Ver. Compl. ¶ 8; Sagi 8/25/10 Ver. Answer ¶ 8 (Leinbach Decl., Exs. 4, 5).  Orly's and Sagi's father, Arie, and mother, Dalia, were married in Israel on July 23, 1967, and remained so until they were divorced in New York on October 26, 2004.  Orly 8/4/10 Ver. Compl. ¶ 16; Sagi 8/25/10 Ver. Answer ¶ 16; Divorce Stipulation, p. 1 (Leinbach Decl., Exs. 4, 5, 12).  Dalia is worth millions of dollars.  See Divorce Stipulation, p. 5; Final Arbitration Award, pp. 11, 16, 17; Sagi 5/20/13 Dep. Tr. at 578:19-579:15 (Leinbach Decl., Exs. 12, 13, 15).

---

[2] Sagi finds himself effectively limited to private companies because of an action the Securities and Exchange Commission brought against him.  Specifically, Sagi served as the Chief Financial Officer, and then Chief Operating Officer, of Lumenis, Ltd., a publicly traded company, from November 1999 to July 2003.  On or about April 26, 2006, the Securities and Exchange Commission commenced an action against Sagi, asserting among other things, that Sagi had Lumenis report millions of dollars in false revenue and profits on Lumenis' financial statements and press releases.  Also in April 2006, Sagi entered into a Consent Judgment permanently enjoining him and his agents from making materially false statements or omitting material facts in connection the sale of any securities, and barring him from serving as an officer or director of a publicly traded company for five years.  See SEC Consent Judgment (Leinbach Decl., Ex. 11).

**B.     The Divorce Stipulation**

6.     As of October 26, 2004, Arie Genger and Dalia Genger were divorced. Complaint ¶ 8; Answer ¶ 8 (Leinbach Decl., Exs. 1, 2); Divorce Stipulation, p. 1 (Leinbach Decl., Ex. 12).

7.     As part of their divorce, Arie and Dalia executed a Stipulation of Settlement (the "Divorce Stipulation").  The Divorce Stipulation was fully executed on October 30, 2004, but expressly provides that it is "made as of October 26, 2004."  Divorce Stipulation, pp. 1, 56-58 (Leinbach Decl., Ex. 12).

8.     Dalia Genger was represented by at least three law firms in connection with the divorce, and the negotiation and execution of the Divorce Stipulation – the Law Offices of Dominic Barbara; Goldman & Greenbaum, P.C.; and Carter Ledyard & Milburn, LLP. Divorce Stipulation, p. 44 (Leinbach Decl., Ex. 12).

9.     Arie Genger was represented by at least two law firms in connection with the divorce, and the negotiation and execution of the Divorce Stipulation – Sonnenschein Nath & Rosenthal LLP (now Dentons US LLP) and Blank Rome LLP.  Divorce Stipulation, p. 44 (Leinbach Decl., Ex. 12).

10.     Sagi did not represent either Arie or Dalia in the divorce.  Sagi 1/16/14 Dep. Tr. at 108:21-109:14 (Leinbach Decl., Ex. 14).

11.     Carol R. Schepp was Dalia's former attorney with Carter Ledyard & Milburn, LLP.  Divorce Stipulation, pp. 44, 52-53, 56.  Carol R. Schepp was involved with the negotiation and execution of the Divorce Stipulation.  Sagi 3/20/14 Dep. Tr. at 14:21-15:11,

38:5-12, 39:9-12; Divorce Stipulation, pp. 44, 52-53, 56 (Leinbach Decl., Exs. 16, 12). Mrs. Schepp has no documents concerning the October 30, 2004 document attached to the Operative Complaint as Exhibit A (the "Sagi Promise Document") or the November 10, 2004 document attached to the Operative Complaint as Exhibit B (the "November Document"). See Schepp Subpoena; Schepp Responses to Subpoena (Leinbach Decl., Exs. 17, 18).

12.     Marilyn B. Chinitz was Dalia's former attorney with the Law Offices of Dominic Barbara. Chinitz Aff. ¶ 3; Divorce Stipulation, p. 44 (Leinbach Decl., Exs. 19, 12). Mrs. Chinitz had no documents concerning the Sagi Promise Document and November Document, and no knowledge of either document. See Chinitz Subpoena; 9/24/14 Chinitz Letter; Chinitz Aff. ¶¶ 1-5 (Leinbach Decl., Exs. 20, 21, 19).

13.     Goldman & Greenbaum, P.C. were Dalia's former attorneys. 10/8/14 Greenbaum Letter; Divorce Stipulation, p. 44 (Leinbach Decl., Exs. 22, 12). Goldman & Greenbaum, P.C. have no documents concerning the Sagi Promise Document and November Document, and no knowledge of either document. See G&G Subpoena; 10/8/14 Greenbaum Letter (Leinbach Decl., Exs. 23, 22). Any documents G&G had were picked up by Dalia. See attachments to 10/8/14 Greenbaum Letter (Leinbach Decl., Ex. 22).

14.     Sonnenschein Nath & Rosenthal LLP (now Dentons US LLP) and Edward Klimerman, a partner at the firm, were Arie's former attorneys. Divorce Stipulation, pp. 44, 56 (Leinbach Decl., Ex. 12). Edward Klimerman represented Arie in connection with the negotiation and execution of the Divorce Stipulation. Sagi 3/20/14 Dep. Tr. at 38:5-16, 39-42:21; Divorce Stipulation, pp. 44, 52-53, 56 (Leinbach Decl., Exs. 16, 12). In response to subpoenas, as narrowed by agreement of the parties, Dentons US LLP undertook a search of its

4

internal emails defined by Sagi counsel as

> …emails to/cc/from, on the one hand, Mr. Klimerman and/or his assistant, Deborah Klempf, and on the other hand, any of the following persons, Sagi Genger, Orly Genger, and/or Carter Ledyard (most likely Carol Robinson Scheff) concerning the October 30, 2004 Agreement, November 10, 2004 Agreement, or the subject matters covered therein (i.e., post-divorce financial support for Dalia by Sagi and/or Dalia), from August 1-December 1, 2004.

8/26/14 Email From Sagi Counsel (Leinbach Decl., Ex. 24).  Denton's search recovered no emails responsive to this search.  10/15/14 Email From Dentons (Leinbach Decl., Ex. 24).

15.     Dalia did not produce any emails or other communications between herself (or her lawyers) and Arie (or Arie's lawyers) prior to execution of the Divorce Stipulation concerning: (i) the Sagi Promise Document; (ii) the November Document; or (iii) any Dalia right to clawback any asset or amount distributed to her children pursuant to the Divorce Stipulation, or any reference to post-divorce financial support of Dalia by Sagi or Orly being a condition of the divorce (hereafter, a "Dalia Clawback").  See Dalia Subpoena; Dalia Response to Subpoena (Leinbach Decl., Exs. 25, 26).  The documents under Dalia's control include (or included) the G&G documents.  See attachments to 10/8/14 Greenbaum Letter (Leinbach Decl., Ex. 22).

16.     Sagi did not produce any emails or other communications between himself and Arie or Arie's lawyers prior to execution of the Divorce Stipulation concerning: (i) the Sagi Promise Document; (ii) the November Document; or (iii) a Dalia Clawback.  See Demand for Sagi Documents; Sagi Production (Leinbach Decl., Exs. 27, 28).

17.     Neither Sagi nor Dalia produced any contemporaneous document showing that the Sagi Promise Document or the November Document was ever forwarded or provided to

Arie (or his counsel) prior to the execution of the Divorce Stipulation.  (Leinbach Decl. ¶ 27 and Ex. 28).

18.     Neither Sagi nor Dalia produced any contemporaneous document showing that the Sagi Promise Document or the November Document was ever forwarded or provided to Orly prior to the execution of the Divorce Stipulation.  (Leinbach Decl. ¶ 27 and Ex. 28).

19.     Neither Sagi nor Dalia produced any contemporaneous document showing that a Dalia Clawback was discussed between Arie and Dalia (or any of their respective myriad counsel) prior to the execution of the Divorce Stipulation.  (Leinbach Decl. ¶ 27 and Ex. 28).

20.     Neither Sagi, nor Dalia, nor Arie produced any drafts of the Divorce Stipulation that referenced the Sagi Promise Document, the November Document, or a Dalia Clawback.  (Leinbach Decl. ¶ 30).[3]

21.     The Divorce Stipulation is 58 pages long (plus exhibits).   Divorce Stipulation (Leinbach Decl., Ex. 12).  It contains no reference to the Sagi Promise Document.  Id. It contains no reference to the November Document.  Id.  It contains no reference to any "Dalia Clawback."  Id.

22.     The Divorce Stipulation states:

"HE OR SHE [Arie Genger or Dalia Genger] UNDERSTANDS THAT THIS AGREEMENT WILL BE BINDING ON HIM OR HER IN ALL CIRCUMSTANCES."

---

[3]   Dalia has claimed "privilege" over several drafts of the Divorce Stipulation and the Sagi Promise Document. See S&W Dalia Privilege Log (Leinbach Decl., Ex. 29); Carter Ledyard Privilege Log (Leinbach Decl., Ex. 64). By doing so, Dalia has acknowledged that these drafts were not shared with Arie.  See, e.g., Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993) (the "voluntary disclosure of work product to an adversary waives the privilege as to other parties").

Divorce Stipulation, p. 56 (capitalization in original) (Leinbach Decl., Ex. 12).

23.    The Divorce Stipulation states it "shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein." Divorce Stipulation, p. 51 (Leinbach Decl., Ex. 12).

24.    The Divorce Stipulation contains an "Entire Understanding Clause," which states:

### ENTIRE UNDERSTANDING

This Agreement contains the entire understanding of the parties who hereby acknowledge that between them there have been and are no representations, warranties, covenants or undertakings (whether written or oral, express or implied) with respect to the subject matter hereof including, without limitation, all rights or claims arising at law, in equity or pursuant to the parties' marital relationship other than those expressly set forth herein or in the transaction contemplated hereby or entered into concurrently herewith.

Divorce Stipulation, p. 53 (Leinbach Decl. Ex. 12).

25.    The Divorce Stipulation contains a releases section, in which Dalia Genger broadly releases Arie Genger and his heirs:

2. The Wife hereby remises, releases and forever discharges the Husband, the Husband's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or equity, known or unknown, which the [Wife][4], the [Wife]'s heirs,

---

[4] In an obvious scrivener's error, the words "Husband" and "Wife" were mistakenly swapped three times in this paragraph IX(2) of the Divorce Stipulation. This error has been corrected in this memorandum and the corrected words marked by [brackets].

> executors, administrators, successors and assigns ever had or now
> has against the [Husband], for, upon, or by reason of any matter,
> cause or thing whatsoever from the beginning of the world to the
> day of the date of this Agreement, including (without limitation)
> claims with respect to all "separate property" and all "marital
> property" as those terms are defined in Section 236(B) of the
> Domestic Relations Law or arising out of the marital relationship,
> except for (a) any amounts that may be due pursuant to the audits
> referred to in Article XII and (b) any cause of action for Divorce,
> Annulment or Separation and any defenses thereto.

Divorce Stipulation, p. 34 (Leinbach Decl., Ex. 12).

26.   The Divorce Stipulation expressly references other documents that were contemplated as being part of the Divorce Stipulation.  For example, the Divorce Stipulation expressly refers to irrevocable proxies that the Orly Genger 1993 Trust and Sagi Genger 1993 Trust must execute concurrently with receiving TRI shares.  Divorce Stipulation, pp. 13-14 (Leinbach Decl., Ex. 12).

**C.   The TRI Shares**

- **The Contemplated TRI Share Transfers to Arie and The Sagi and Orly Trusts**

27.   The Divorce Stipulation provides that TPR Investment Associates, Inc.'s ("TPR") 52.85% ownership interest in Trans-Resources, Inc. ("TRI")[5] be transferred (19.43% each) to the Orly Genger 1993 Trust (the "Orly Trust") and Sagi Genger 1993 Trusts (the "Sagi Trust"), with the remainder (13.99%) going to Arie.  Divorce Stipulation, pp. 12-14 (Leinbach Decl., Ex. 12).

---

[5]   The remaining 47.15% was owned by Glenclova Investment Company and TR Investors, LLC, who were controlled by Jules Trump, Eddie Trump, and Mark Hirsch (collectively, the "Trump Group").

28.     The Divorce Stipulation expressly states "[f]ollowing the foregoing transfers of the TRI Stock, the Wife will have no ownership interest in TRI." Divorce Stipulation, p. 14 (Leinbach Decl., Ex. 12).

29.     On October 26, 2004, pursuant to Art. II(9)(c) of the Divorce Stipulation, the TPR Board approved the transfer of the TRI shares.  See TPR Board Resolution (Leinbach Decl., Ex. 30).  The TPR Board Resolution does not reference the Sagi Promise Document, the November Document, or any Dalia Clawback.  Id.

30.     On October 30, 2004, pursuant to the TPR Board Resolution, TPR executed a letter agreement (the "Transfer Agreement") requiring TPR to transfer its TRI shares to the Orly Trust, Sagi Trust, and Arie on October 30, 2004.  Transfer Agreement (Leinbach Decl., Ex. 31).  The Transfer Agreement does not reference the Sagi Promise Document, the November Document, or any Dalia Clawback.  Transfer Agreement (Leinbach Decl., Ex. 31).

31.     As of October 26, 2004, and fully executed on October 30, 2004, and pursuant to Art. II, 9(a)(ii) of the Divorce Stipulation, the Orly Trust and Sagi Trust, by their Trustees, entered into voting proxy agreements.  These voting proxy agreements sought to provide Arie with the power to vote the Orly Trust and Sagi Trust TRI Shares during his lifetime. Voting Proxy Agreement (Leinbach Decl., Ex. 31).

32.     When the Divorce Stipulation and Transfer Document were executed all members of the Genger family (Arie, Dalia, Sagi and Orly) believed the transfers of the TRI Shares to Arie, the Orly Trust and Sagi Trust were valid and enforceable.  Orly 9/20/11 Compl. ¶ 57; Sagi/TPR 4/25/13 Answer ¶ 57; Sagi 1/16/14 Dep. Tr. at 178:12-25 (Leinbach Decl., Exs. 32, 33, 14).

33.     As part of the divorce, Sagi Genger was appointed CEO of TPR.   TPR Shareholders Agreement, Section 2.2 (Leinbach Decl., Ex. 10).  Sagi promised to do all that was necessary to effectuate the transfer of TRI shares.  Specifically the Transfer Document, signed by Sagi as TPR CEO states:

> In case, at any time hereinafter, any further action is necessary or desirable to carry out the purpose of this Letter Agreement, each of the parties hereto shall take or cause to be taken all necessary action, including, without limitation, the execution and delivery of such further instruments and documents which may be reasonably requested by any party for such purpose or otherwise to complete or perfect the transactions contemplated hereby.

Transfer Agreement (Leinbach Decl., Ex. 31).

- **TPR's Sale Of The Supposedly Transferred TRI Shares to the Trump Group**

34.     On August 22, 2008, Sagi, as President of TPR, and Rochelle Fang, as Trustee of the Sagi Trust,[6] sold the Sagi Trust TRI Shares to the Trump Group for $26.7 million.  See Stock Purchase Agreement (Leinbach Decl., Ex. 34).  Paragraph 10 of the Stock Purchase Agreement states:

> 10.  Valid Transfer.  If at any time following the Closing Date, it is determined that Seller [the Sagi Trust] is not the record and beneficial owner of the Shares as of the date hereof by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, . . . the parties hereby agree that (a) this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement . . .

---

[6]   Rochelle Fang is Sagi's mother-in-law. Orly 9/20/11 Compl. ¶ 8; Sagi/TPR 4/25/13 Answer ¶ 8 (Leinbach Decl., Exs. 32, 33).

Id. ¶ 10.  Accord TRI Investors, LLC v. Genger, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010) ("That [Stock] Purchase Agreement included a provision indicating that, if the share transfer to the Sagi Trust were found void, then the share purchase would be between the Trump Group and TPR, which Sagi Genger controlled by 2008.").

      35.    On August 22, 2008, Sagi, as President of TPR, sold the Arie TRI Shares and the Orly Trust TRI Shares to the Trump Group, on condition that TPR – and not Arie or the Orly Trust – be determined to be the record and beneficial owners of those TRI Shares;

> In connection with the transactions contemplated by the Purchase Agreement, if at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any reason (the shares being so affected being referred to herein as the "Affected Shares") then (a) upon the written request from the Purchasers, TPR shall promptly take all necessary action to effect the transfer of all Affected Shares . . . to the Purchasers [the Trump Group].

August 22, 2008 Side Letter Agreement (Leinbach Decl., Ex. 35).  Sagi (via TPR) sold the Orly Trust TRI Shares to the Trump Group for approximately $10.3 million.  Id.; see also Sagi 1/17/14 Dep. Tr. at 478:10-23 (Leinbach Decl., Ex. 37).  Pursuant to the Side Letter Agreement, TPR would receive the approximately $10.3 million in proceeds from the sale of the Orly Trust TRI Shares.  Side Letter Agreement; Sagi 1/17/14 Dep. Tr. at 478:10-23 (Leinbach Decl., Exs. 35, 37).

      36.    TPR and the Sagi Trust later entered into a Release amongst themselves. In that Release, TPR and the Sagi Trust stated, in pertinent part, as follows:

WHEREAS, the prospective parties to the SPA specifically acknowledged that it is possible that the Trust might not be the record and beneficial owner of the Shares by virtue of a prior of [sic] transfer of Shares to it by TPR Investment Associates, Inc., a Delaware corporation ("TPR") being deemed to have been void, and as such all the rights, title, and interest in and to the Shares are held by TPR, and therefore the parties have agreed that, in such case, the SPA will be deemed to have been entered into and consummated by TPR, in lieu of the Trust; and

\* \* \*

2. Upon surrender of such assets in the original value of $6,850,000 (the "Surrender") TPR hereby releases the Trust...

3. TPR hereby relinquishes any and all rights it might have to the Remainder owed to the Trust from the various parties to the SPA...

Release (Leinbach Decl., Ex. 36).

37.     Pursuant to these documents, all signed by Sagi, if a Court determined the Divorce Stipulation transfer of TRI Shares was void, then it was TPR who owned all the TRI Shares and sold all the TRI Shares to the Trump Group. See Stock Purchase Agreement, Side Letter Agreement, and Release (Leinbach Decl., Exs. 34, 35, 36).

- **The Court Decisions Finding the TRI Shares Were Never Transferred from TPR**

38.     On August 25, 2008, the Trump Group commenced a special limited *in rem* proceeding under Title 8, Section 225 of the Delaware Code against Arie to determine the composition of TRI's Board of Directors. 1/2/13 Decision and Order at 5 (Leinbach Decl., Ex. 38). Neither Orly nor the Orly Trust were parties to this Delaware action. TR Investors, LLC v. Genger, 2010 Del. Ch. LEXIS 153, *1 (Del. Ch. July 23, 2010) (Leinbach Decl., Ex. 39). Sagi Genger testified on behalf of the Trump Group. See id., *35, n.75 (citing Sagi testimony).

39.     On July 23, 2010, the Delaware Chancery Court rendered a decision (the

"Merits Decision"), finding that, because Arie had failed to prove prior notice to the Trump Group before the transfer of TRI shares pursuant to the Divorce Stipulation and Transfer Agreement, the TRI Share transfers were void <u>ab initio</u> pursuant to the TRI Stockholders Agreement between TPR and the Trump Group and, as a result, the Orly Trust TRI Shares had reverted to TPR. See <u>TR Investors, LLC</u>, 2010 Del. Ch. LEXIS 153, at *5; 1/2/13 Decision and Order at 5 (Leinbach Decl., Exs. 39, 38):

> In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife. Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders Agreement. <u>Under the terms of the Stockholders Agreement, that violation rendered the transfers ineffective</u> and gave the Trump Group the right to acquire the shares that were transferred.

7 <u>TR Investors, LLC</u>, 2010 Del. Ch. LEXIS 153, at *3 (emphasis added) (Leinbach Decl., Ex. 39); <u>see also id.</u>, at *67 ("Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them."). Despite these findings, the Chancery Court held that, because Orly and the Orly Trust were not properly before the Court, it would decline to issue an Order with regard to the Orly Trust TRI Shares. <u>Id.</u>

40.    On August 9, 2010, the Delaware Chancery Court amended its July 23, 2010 decision finding that it could rule as to the Orly Trust TRI Shares. The Chancery Court determined that the transfer of the Arie TRI Shares and Orly Trust TRI Shares pursuant to the Divorce Stipulation were void for the same reason and, accordingly, that the Arie TRI Shares and Orly Trust TRI Shares belonged to TPR, and the Trump Group were entitled to purchase

those shares pursuant to the Side Letter Agreement.   TR Investors, LLC v. Genger, 2010 Del.

Ch. LEXIS 170, *13 (Del. Ch. Aug. 9, 2010) (Leinbach Decl., Ex. 40).   Per the Delaware

Chancery Court:

> That [judicial] determination is whether the Arie and Orly Shares
> are validly owned by Arie Genger and the Orly Trust. Again, the
> answer is no, they are not. The transfers were invalid. That left the
> Trump Group with the right to purchase the Shares from TPR, ...
> neither of those transferees ever had a legitimate interest in the
> shares.

Id., *12.

41.     After the Delaware Chancery Court's July 23, 2010 and August 9, 2010

decisions, Sagi and TPR (controlled by Sagi) have consistently argued in the New York state

courts, the New York federal courts, and in Delaware that the Orly Trust never received shares of

TPR, because the supposed transfer to the Orly Trust of those shares were void ab initio.  For

example, in August 2010, Sagi verified to the New York state court:

> Orly Genger does not have standing to sue in connection with the
> TRI shares because Vice Chancellor Strine of the Chancery Court
> of the State of Delaware has recently ruled that the shares at issue
> belong to TPR Investment Associates, Inc., not the Orly Genger
> 1993 Trust.

Sagi 8/25/10 Verified Answer, First Affirmative Defense; see also id. ¶¶ 28, 29, 30, 80, 81, 83,

84 (Leinbach Decl., Ex. 5).

42.     By Decision dated July 18, 2011, Delaware Supreme Court overturned the

"Side Letter Decision," ruling, in relevant part, that the Delaware Chancery Court lacked

personal jurisdiction over the Orly Trust, and thus lacked the power to decide who was entitled

to beneficial ownership of the Orly Trust TRI Shares.  Genger v. TR Investors, LLC, 26 A.3d

180, 202-203 (Del 2011) (Leinbach Decl., Ex. 41).   The Delaware Supreme Court affirmed, however, the Chancery Court's "Merits Decision."   Id.

43.    On October 4, 2011, Dalia, purportedly acting as Trustee of the Orly Trust, commenced a lawsuit in Delaware Chancery Court seeking a determination with regard to the Orly Trust TRI Shares (the "Dalia Delaware Action").   Dalia Delaware Compl. (Leinbach Decl., Ex. 42).   By commencing the action in Delaware, Dalia provided the Delaware Chancery Court with jurisdiction over the Orly Trust. Id. (Leinbach Decl., Ex. 42).[7]

44.    When the restraints were lifted, Dalia (as Trustee of the Orly Trust) and TPR (controlled by Sagi) drafted and entered into a Stipulation between them, that was "So Ordered" by the Delaware Chancery Court.   The So-Ordered Delaware Stipulation stipulated and agreed to the validity of the TPR sale of the Orly Trust TRI Shares to the Trump Group, and to the Trump Group's ownership "(beneficially, of record, and otherwise)" of the Orly Trust TRI Shares.   So-Ordered Delaware Stipulation at ¶ 2 (Leinbach Decl., Ex. 45).   The So-Ordered Delaware Stipulation stated that among the findings "essential to the Court's determinations and findings" was "(ii) the transfers were void and the stock reverted to TPR, and (iii) the Trump Group had the right to buy all of the improperly transferred [TRI] stock from TPR", including the Orly Trust TRI Shares. Id. at 1-2.

---

[7]   Because this maneuver by Dalia was a transparent attempt to have the proceeds of the Orly Trust TRI Shares given to TPR/Sagi, Orly obtained two temporary restraining orders in New York state court on October 26, 2011 and November 9, 2011 (later continued by an April 10, 2012 Interim Decision) preventing Dalia, TPR and the Trump Group from prosecuting the Dalia Delaware Action.   See Orders Restraining Dalia Delaware Action (Leinbach Decl., Ex. 43).   These restraints were lifted as part of Orly's individual settlement with the Trump Group.   See 2d Am. Stipulation of Dismissal (Leinbach Decl., Ex. 44).

- **Dalia and Sagi's Successful Argument to this Court (Keenan, J.) that the Proceeds of the Sale of the Orly Trust Shares by TPR Should Be Paid to TPR**

45.    In November 2013, TPR commenced an action in this court before the Honorable John F. Keenan seeking an order transferring the $10.3 million in proceeds from the sale of the Orly Trust TPR Shares (the "Proceeds"). Repeatedly, TPR argued that it was entitled to the Proceeds because the Orly Trust TRI Shares had never belonged to the Orly Trust:

> Namely, the 2004 transfer of shares to Arie and the Orly Genger 1993 Trust (the "Orly Trust") were found to be invalid [by the Southern District Court], and the shares rightfully sold by TPR to the Trump Group.

TPR Brief at 2 (Leinbach Decl., Ex. 46); accord id. at 4 ("TPR adamantly denies that there is anything 'unjust' about it receiving proceeds for the sale of its own corporate assets").

> TPR's claim could not be more straightforward. TPR once owned 1,102.8 shares of TRI. TPR sold those shares for $10.3 million. The courts have now confirmed that TPR owned and had the right to sell those TRI shares, which this Court previously held to be the "condition precedent" to disbursing the sale proceeds to TPR. In short, everything which could be litigated has now been litigated, and so the time has come for the escrow agent to pay TPR.

TPR Reply Brief (Leinbach Decl., Ex. 47).

46.    During the oral argument before Judge Keenan, TPR counsel John Dellaportas argued that TPR was the owner of the sale Proceeds because the Orly Trust had never received the Orly Trust TRI Shares:

> They also said that Chancellor Strine's ruling, paragraph 2, speaks only as the buyer and not the seller. Absolutely incorrect. What Chancellor Strine ruled in paragraph 2 was, "The Trump Group, having closed on the purchase of the so-called Orly Trust shares" -- here's the important part -- "pursuant to and under the terms of

> the side letter agreement between TPR and the Trump Group."
> That's the ruling.   The side letter agreement is in the record.
> That's a contract whereby we sold those shares to them.   Exactly
> the ruling your Honor said we needed to get in order to get our
> proceeds.
>
> We've gotten the ruling that the Court asked us to get.   We would
> now like our proceeds.  Thank you very much, your Honor.

4/29/14 Hearing Tr. at p. 34:3-16 (TPR Counsel Dellaportas) (Leinbach Decl., Ex. 48).  At that

same oral argument, Dalia counsel stated:  "We [Dalia] don't object if this Court would direct

the escrow[ed millions] be given to TPR." Id. at 13.

47.      By decision dated May 15, 2014, Judge Keenan ruled, based upon TPR's

arguments, that the $10.3 million in proceeds should be transferred to TPR.  TPR Investment

Associates, Inc. v. Pedowitz & Meister LLP, 2014 U.S. Dist. LEXIS 67116, *23 (S.D.N.Y May

15, 2014) (Leinbach Decl., Ex. 49)

48.      On May 15, 2014, TPR received the Proceeds.   Escrow Agent Letter

(Leinbach Decl., Ex. 50).

**D.      Material Facts Relating to the Sagi Promise Document**

49.      On October 18, 2004, Sagi's attorney sent Sagi drafts of the language for a

promise document (hereafter, the "Drafts").  See 10/18/04 Email (Leinbach Decl., Ex. 58).  No

emails or other contemporaneous communications have been produced showing that these Drafts

were ever shared with Arie, Arie's lawyers, or Orly prior to execution of the Divorce Stipulation.

See Undisputed Facts 11-18.

50.      The Drafts had a signature block for Orly, and provided for the promise

of support to Dalia to be joint and several between Orly and Sagi.  See 10/18/04 Email (Leinbach

Decl., Ex. 58).  No signed version of the Drafts has been produced in this matter.  Leinbach Decl. ¶ 60.

51.    On October 30, 2004, Dalia and Sagi signed the Sagi Promise Document. See Sagi Promise Document, Operative Complaint, Ex. A (Leinbach Decl., Ex. 1).  Contrary to the Drafts, Orly is not a signatory to the Sagi Promise Document, and there is no signature block for her.  Id.  Contrary to the Drafts, the Sagi Promise Document does not provide for any promise to pay by Orly.  Id.  The only promise to pay is Sagi's promise to pay: "You [Dalia] may request in writing that I [Sagi] make payment to you as provided in this letter.  Promptly upon receipt of the request, I [Sagi] will pay to you …."  Id.; see also id. ("This letter confirms our understanding with respect to certain payments that I [Sagi] am prepared to make to you …").

52.    The Sagi Promise Document specifically identifies the "receipt" by the Sagi and Orly Trusts of TRI Shares "for our [Orly and Sagi's benefit]" as the supposed "consideration" for the Sagi Promise Document:

> This letter confirms our understanding with respect to certain payments that I am prepared to make to you in consideration of the following:  My sister Orly and I are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for our benefit.  In reliance on this letter and in consideration of the trusts' receipt of these shares and other consideration, you are giving up valuable marital rights, and you desire further assurance that you will have sufficient funds to support your lifestyle.

Sagi Promise Document.

53.    The only other value Sagi purports to have received in consideration of his promise to his mother in the Sagi Promise Document is his happiness as a son, seeing his parent's conclude their divorce proceedings.  Operative Complaint at ¶ 8; Prior Complaint at ¶ 8

(Leinbach Decl., Exs. 1, 59).

54.     Dalia did not identify the Sagi Promise Document as a marital asset during the marital arbitration she brought pursuant to the Divorce Stipulation in or around 2007. <u>See</u> List of Marital Assets; Final Marital Arbitration Award (Leinbach Decl., Exs. 55, 13)<u>; accord</u> Affidavit of Franklin B. Velie, former Dalia attorney (Leinbach Decl., Ex. 60).

**E.     <u>Material Facts Relating to the November Document</u>**

55.     The record before the Court contains no evidence that the November Document was drafted before November 10, 2004. Sagi Decl. ¶ 6; (Leinbach Decl. ¶ 53 and Ex. 51).

56.     The November Document was not executed by anyone until on or after November 10, 2004.  11/10/04 Email from Sagi to Orly (Leinbach Decl., Ex. 52).

57.     By the time the November 10 Document was drafted, the Divorce Stipulation was signed and was binding "IN ALL CIRCUMSTANCES" on Dalia, Arie, Orly, and Sagi.  See Divorce Stipulation, pp. 51, 56 (Leinbach Decl., Ex. 12).

58.     Sagi testified he obtained and maintained possession of the original copy of the November Document.  Sagi Dep. Tr. at 94:23-95:20; Parnes Decl. ¶¶ 8, 10 (Leinbach Decl., Exs. 16, 53).

59.     Sagi has never produced a copy of the November Document with an original Orly signature.  Only the Sagi signature is an original signature; the Orly signature is a

photocopy of a signature.[8]  Leinbach Decl. ¶56.

**F.      Sagi's Failure to Give Orly an Opportunity to Defend**

        60.      Sagi first provided Orly counsel with a copy of Dalia Genger's written demand for $200,000 on January 29, 2014.  1/29/14 Email (Reply Leinbach Decl., Ex. 56).

        61.      Sagi first demanded $100,000 from Orly on February 17, 2014. Compl. ¶ 13; Orly Decl. ¶ 10 (Leinbach Decl., Exs., 1, 57).

        62.      On or about February 3, 2014, Sagi purports to have paid Dalia $200,000. Sagi Reply Decl., Ex. H (Leinbach Decl., Ex. 61).

        63.      Sagi never told Orly he was paying Dalia $200,000 before February 17, 2014.  Orly Decl. ¶ 10 (Leinbach Decl., Ex. 57).

        64.      By February 17, 2014, Sagi knew that Orly disputed the validity and enforceability of the Sagi Promise Document and the November Document.  Lance Harris Decl. ¶ 5; (Leinbach Decl., Ex. 62).

---

[8]      Orly has retained an ink expert to review the November Document, but Sagi counsel have not yet given the ink expert access to the November Document or the Sagi Promise Document.  After cancelling an October 14, 2014 examination of those documents on October 2, 2014, the next date provided by Sagi counsel was October 30, 2014 (Leinbach Decl. ¶ 56 and Ex. 54).

65.     Sagi first sued Orly for breach of contract on February 18, 2014, the day after his purported demand to Orly.  <u>See</u> Prior Complaint (Leinbach Decl., Ex. 59).

Dated:   New York, New York
         October 20, 2014

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
         Yoav M. Griver
         Bryan D. Leinbach
         *Attorneys for Orly Genger*
         1211 Avenue of the Americas
         New York, New York 10036
         (212) 223-0400