UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X

SAGI GENGER,                                        :
                                                    :
                              Plaintiff,            :        1:14-cv-05683 (KBF)
                                                    :
              -against-                             :
                                                    :
ORLY GENGER,                                        :
                                                    :
                              Defendant.            X
--------------------------------------------------------------------------

**PLAINTIFF SAGI GENGER'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ORLY GENGER'S MOTION FOR SUMMARY JUDGMENT**

MORGAN, LEWIS & BOCKIUS LLP
John Dellaportas
Nicholas Schretzman
Mary C. Pennisi
101 Park Avenue
New York, New York 10178-0060
Tel.:  (212) 309-6000
Fax:  (212) 309-6001

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT ................................................................................................................. 5

I.     LEGAL STANDARD ........................................................................................... 5

II.    THE NOV. 10, 2004 INDEMNITY IS SUPPORTED BY THREE FORMS OF
CONSIDERATION .............................................................................................. 6

      A.    Sagi Suffered a Detriment, Which Alone Constitutes Sufficient
Consideration for the Nov. 10, 2004 Indemnity ................................... 6

      B.    The Orly Trust Received TRI Shares in 2004, Which Also Constitutes
Consideration for the Nov. 10, 2004 Indemnity ................................... 7

      C.    Orly Received an Additional Benefit in the Form of Peace by Ending a
Protracted Family Dispute ................................................................. 10

III.   JUDICIAL ESTOPPEL DOES NOT BAR SAGI'S CLAIMS ................................... 11

      A.    Litigation Backdrop ........................................................................... 12

      B.    The 2004 Transfers Were Never Determined to Be Void *Ab Initio* .................. 18

IV.   THE DIVORCE STIPULATION'S INTEGRATION CLAUSE DOES NOT BAR
SAGI'S CLAIMS ............................................................................................... 20

V.    ANY MUTUAL MISTAKE OF FACT DOES NOT RENDER THE NOV. 10,
2004 INDEMNITY UNENFORCEABLE ............................................................... 21

VI.   ORLY HAD NO RIGHT TO DEFEND AGAINST DALIA'S CLAIM ....................... 22

VII.  SAGI CAN ALSO ESTABLISH HIS EQUITABLE CLAIM FOR
PROMISSORY ESTOPPEL ................................................................................. 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*,
282 F.3d 92 (2d Cir. 2002).....................................................................................8

*Amex Assurance Co. v. Caripides*,
179 F. Supp. 2d 309 (S.D.N.Y. 2002),
*aff'd*, 316 F.3d 154 (2d Cir. 2003) .......................................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................5

*Arie Genger & Orly Genger v. Sagi Genger, et al.*,
No. 651089/2010 (N.Y. Sup. Ct. N.Y. Cnty.)......................................................15

*Bd. of Trustees of Sheet Metal Workers Local Union No. 137 Ins. Annuity v.
Vic Constr. Corp.*,
825 F. Supp. 463 (E.D.N.Y. 1993) .......................................................................22

*Bunn v. Bartlett*,
8 N.Y.S. 160 (Gen. Term 1889)...........................................................................11

*BWA Corp. v. Alltrans Express U.S.A., Inc.*,
112 A.D.2d 850 (1985) ..........................................................................................9

*Chimart Assoc. v. Paul*,
66 N.Y.2d 570 (1986) ..........................................................................................21

*Ciocca v. Neff*,
2005 WL 1473819 (S.D.N.Y. June 22, 2005) .....................................................24

*Collins v. Harrison-Bode*,
303 F.3d 429 (2d Cir. 2002)..................................................................................22

*Comm. Futures Trading Comm'n v. Walsh*,
17 N.Y.3d 162 (2011) ..........................................................................................11

*Comm. Futures Trading Comm'n v. Walsh*,
3 F. Supp. 3d 70 (S.D.N.Y. 2014) .......................................................................11

*Commander Oil Corp. v. Advance Food Serv. Equip.*,
991 F.2d 49 (2d Cir. 1993).....................................................................................9

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*,
301 A.D.2d 70 (1st Dep't 2002) ...........................................................................23

*Dalia Genger v. TR Investors, LLC, et al.*,
  C.A. No. 6906-CS (Del. Ch.) ........................................................................16

*Darling v. Darling*,
  22 Misc. 3d 343 (Sup. Ct. Kings Cnty. 2008) ...............................................11

*Decker v. Vermont Educ. Television, Inc.*,
  13 F. Supp. 2d 569 (D. Vt. 1998) ...................................................................18

*Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust*,
  74 A.D.3d 32 (1st Dep't 2010) .......................................................................23

*Durand v. Ackerman*,
  2010 WL 3834587 (E.D.N.Y. Bankr. Sept. 27, 2010) ....................................11

*Dynamics Corp. of Am. v. Int'l Harvester Co.*,
  429 F. Supp. 341 (S.D.N.Y. 1977) ...................................................................9

*Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*,
  804 F.2d 787 (2d Cir. 1986) ...........................................................................24

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
  22 F.3d 1219 (2d Cir. 1994) .............................................................................5

*Genger v. Genger*,
  121 A.D.3d 270 (1st Dep't 2014) .........................................................12, 13, 25

*Genger v. TR Investors, LLC*,
  26 A.3d 180, 189 (Del. 2011) ....................................................................14, 19

*Glenclova Inv. Co. v. Trans-Res., Inc.*,
  874 F. Supp. 2d 292 (S.D.N.Y. 2012) ......................................................12, 13, 14

*Glenclova Inv. Co. v. Trans-Resources, Inc.*,
  No. 08 Civ 7140 (JFK) (S.D.N.Y. Aug. 11, 2008) .........................................13

*Gordon v. Vincent Youmans, Inc.*,
  358 F.2d 261 (2d Cir. 1965) .............................................................................9

*Henneberry v. Sumitomo Corp. of Am.*,
  532 F. Supp. 2d 523 (S.D.N.Y. 2007) ............................................................24

*Hollander v. Lipman*,
  65 A.D.3d 1086 (2d Dep't 2009) ......................................................................7

*Holt v. Feigenbaum*,
  52 N.Y.2d 291 (1981) .......................................................................................6

*In re Cersosimo*,
2009 WL 3182989 (E.D.N.Y. Bankr. Sept. 29, 2009)...........................................................11

*In re Teligent*,
268 B.R. 723 (Bankr. S.D.N.Y. 2001) ....................................................................................9

*Kurz v. United States*,
156 F. Supp. 99 (S.D.N.Y. 1957),
*aff'd*, 254 F.2d 811 (2d Cir. 1958) .........................................................................................9

*Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*,
2014 WL 2481904 (S.D.N.Y. June 2, 2014) ........................................................................25

*Maharaj v. Bankamerica Corp.*,
128 F.3d 94 (2d Cir. 1997).....................................................................................................18

*Mangini v. McClurg*,
24 N.Y.2d 556 (1969) ............................................................................................................11

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
1994 WL 164057 (S.D.N.Y. Apr. 21, 1994).........................................................................23

*Nau v. Vulcan Rail & Constr. Co.*,
286 N.Y. 188 (1941) ................................................................................................................9

*Ross v. Food Specialties, Inc.*,
6 N.Y.2d 336 (1959) ..............................................................................................................22

*This Is Me, Inc. v. Taylor*,
157 F.3d 139 (2d Cir. 1998)...............................................................................................8, 10

*Torrence v. Hastings*,
178 A.D.2d 803 (3d Dep't 1991) .............................................................................................1

*TPR Inv. Associates, Inc. v. Pedowitz & Meister LLP*,
2014 WL 1979932 (S.D.N.Y. May 15, 2014) ...................................................16, 17, 18, 21

*TR Investors, LLC et al. v. Arie Genger et al.*,
C.A. No. 3994-VCS, ¶ 12 (Del. Ch. Ct. Aug. 19, 2011) .....................................................19

*TR Investors, LLC v. Genger*,
2010 WL 3279385 (Del. Ch. Aug. 9, 2010),
*rev'd*, 26 A.3d 180 (Del. 2011)........................................................................................14, 19

*Trade Wind Distribution, LLC v. Unilux Ag*,
2011 WL 4382986 (E.D.N.Y. Sept. 20, 2011) .......................................................................8

*TVT Records v. Island Def Jam Music Grp.*,
412 F.3d 82 (2d Cir. 2005)....................................................................................................10

*Weiner v. McGraw-Hill, Inc.*,
    57 N.Y.2d 458 (1982) ................................................................................................7

**STATUTES AND RULES**

8 Del. Code § 225 ........................................................................................................8

Fed. R. Civ. P. 56(c) ..................................................................................................12

**OTHER AUTHORITIES**

*Contracts*, § 863 (3d ed. 1970) ................................................................................19

Restatement of Contracts 2d § 90 ............................................................................25

## PRELIMINARY STATEMENT

In its October 7, 2014 Order, this Court held – at Orly's urging – that "resolution of this action will be based on evidence surrounding the circumstances of defendant's alleged entry into the indemnification agreement in 2004." Doc. No. 26 at 1-2. Less than two weeks later, Orly now moves for summary judgment, based on a willful mischaracterization of a series of Court decisions which happened between 2010 and 2013.

We discuss the convoluted Genger family litigations below. Nothing in any of those cases, however, changes the fact that Orly made a promise to her brother Sagi to share 50-50 in their mother Dalia's financial support, nor that Sagi relied on that promise to his detriment, nor that Orly obtained tangible benefits in exchange for that promise. While Orly tries her utmost to mislead the Court on this point, it is without question that her trust received valuable shares of TRI stock in 2004, and that she has since personally received millions of dollars in payments attributable to those shares (how many millions, she will not say). Meanwhile, Dalia has become impoverished paying legal bills defending Orly's frivolous lawsuits against her. (Most of Orly's suits have already been dismissed, and not one has ever been adjudicated in Orly's favor.) Early this year, Dalia asked for $200,000 in financial support – a fraction of the windfall she bestowed upon her two children in 2004. Sagi paid this amount, as he was obligated to do, and asked Orly to reimburse half, as she was obligated to do. Orly reneged.

Orly has since offered this Court a shifting series of excuses, all of it soaked in invective and bile. First, as Your Honor will recall, she had her counsel unequivocally represent to the Court that the document Sagi was putting forward was a "forgery." Orly retained a team of experts who spent a full three days examining the document, but apparently none of them would back her story. Yet rather than retracting this unseemly and untrue allegation, Orly now only claims amnesia, saying that she cannot *remember* signing the document.

Even were it true, amnesia is no defense to breach of contract.  Because she can no longer deny the contract she signed, Orly instead seeks to take advantage of a fortuitously-timed vacation.  In October 2004, after Orly and Sagi had orally committed to financially support their mother 50-50, Orly left for a yacht trip off the coast of Fiji.  Thus, she was not around to physically sign the papers on the day that her parents' divorce settlement closed.  Instead, upon her return to the United States, she signed a separate document reflecting her previous oral promise.  Orly now contends that her signature committed her to nothing, because her trust had already received the consideration by the time she signed the document.

That defense, too, is unavailing.  Under New York law, interrelated documents such as the Oct. 30, 2004 Promise and the Nov. 10, 2004 Indemnity can be signed on different dates and still provide consideration for one another.  In apparent recognition of this fact, Orly shifts gears again and now claims that her trust never received the TRI shares at issue in this case.  This is flat-out false.  As set forth below, Orly's trust most definitely received those shares in 2004.  In 2011, the Delaware Supreme Court held that the 2004 share transfer was void as to <u>record</u> ownership, but not as to <u>beneficial</u> ownership.  In other words, Orly's trust still had rights as beneficial owner of those TRI shares.  Orly then caused those rights to be sold to a third party.  Specifically, she accepted a large cash payment in exchange for stipulating (and causing her trust to stipulate) that the Trump Group, and not her trust, now owned the TRI shares.  Once she did so, Judge Keenan (citing to Orly's own stipulation) held that her trust's claim to those shares, and to the sale proceeds therefrom, had been extinguished.

None of that means, however, that Orly and her trust did not receive consideration from Dalia's bequest.  They plainly did.  Orly is an Ivy League-educated, sophisticated businessperson who understands what she signs.  She should be held to the commitments she has made.

## STATEMENT OF FACTS[1]

In 2002, Dalia and Arie became embroiled in a bitter divorce.  By 2004, the Genger family was being torn apart, as Dalia and Arie bitterly negotiated their divorce settlement, seemingly without end.  *See* Answr. Decl., Exh. A, Tr. 16:22-17:2.  One issue holding up the divorce was Dalia's skepticism of Arie's claim that the family's TRI stock had no value.  *Id.*, Exh. A, Tr. 16:2-16:6.  In 2004, a deal was struck among Dalia, Orly and Sagi, whereby Dalia agreed, as part of the divorce settlement, to convey her marital rights to her 794.40 shares of TRI to two trusts for the benefit of Sagi and Orly, with a right to claw back her living expenses if the TRI shares ended up having economic value.  *Id.*, Exh. A, Tr. 23:10-23:13.

The parties' oral agreement was thereafter reduced to writing in two related documents. First, under a co-signed letter dated October 30, 2004 (the "Oct. 30, 2004 Promise"), Sagi agreed to pay Dalia an amount up to all dividends, distributions, proceeds or other payments attributable to the shares of TRI that either Sagi and Orly (or any trust for the benefit of either of them) received, upon demand by Dalia.  Answr. Decl., Exh. AAA.  Obviously, the only reason Sagi was committing to repay Dalia for amounts received by *Orly* was because his sister had already verbally agreed to shoulder half of the financial commitment.

Second, as she had promised to do, Orly executed a co-signed letter dated November 10, 2004 (the "Nov. 10, 2004 Indemnity") agreeing to "indemnify, defend, and hold [Sagi] harmless, for and against one-half … of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations …, including [Sagi's] reasonable counsel and

---

[1]     The facts herein are drawn from the declarations filed in the predecessor case, No. 1:14-cv-01006, of David Parnes, executed on May 29, 2014 ("Parnes Decl."), Sagi Genger, executed on May 29, 2014 ("May 29 Sagi Decl."), Dennis Ryan, executed on May 29, 2014 ("Ryan Decl."), Sagi Genger, executed on July 7, 2014 ("July 7 Sagi Decl."), and Dalia Genger, executed on July 7, 2014 ("Dalia Decl."), and are annexed to the Declaration of John Dellaportas, dated November 14, 2014 ("Answr. Declaration"), and are filed herein as Exhibits B-F, respectively.

other professional fees, expenses and costs, which arise from [Sagi's] undertakings [to Dalia] in the [Oct. 30, 2004 Promise]." Parnes Decl., Exh. B, ¶ 9; Answr. Decl., Exh. BBB.

The parties' agreement was executed in two parts because, as noted above, on October 30, 2004 – the closing date of Arie's and Dalia's stipulation of settlement (the "Divorce Stipulation") – Orly was vacationing on a yacht off the coast of Fiji. Parnes Decl., Exh. B, ¶ 5; Answr. Decl., Exh. A, Tr. 30:8-30:18, 43:18-43:22; Exh. G (Divorce Judgment, dated Jan. 7, 2005), Exh. H at 0008-0010. Before leaving for Fiji, however, Orly orally agreed with Sagi to grant Dalia a clawback for living expenses, should the TRI shares generate value – an agreement she then reconfirmed by telephone on the October 30, 2004 closing date. Answr. Decl., Exh. A., Tr. 29:18-29:21, 32:10-32:12, 98:12-99:16; July 7 Sagi Decl., ¶ 5. To ensure compliance, the underlying divorce papers were held in escrow until Orly executed the Nov. 10, 20104 Indemnity. Parnes Decl., Exh. A, ¶ 9. Thereafter, on January 7, 2005, the Court approved the Divorce Stipulation and entered a final judgment of divorce pursuant to the agreed-upon terms of the parties. *Id.*, Exh. G (Divorce Judgment, dated Jan. 7, 2005).

As it turned out, Dalia's skepticism of her husband's veracity was well-placed, as the TRI shares did have substantial economic value. Answr. Decl., Exh. I, ¶ 8. Meanwhile, in the years immediately following her parents' divorce, Orly grew estranged from her mother Dalia, and at her father's behest launched an effort to bankrupt her mother through endless lawsuits, including, *inter alia*: (a) *three* unsuccessful petitions to remove her mother as trustee of her trust (Orly is now on her fourth petition, with little more success); (b) a lawsuit seeking to force her mother to undo her Divorce Stipulation with her father Arie, or pay hundreds of millions of dollars in damages, which complaint the trial court dismissed and the Appellate Division affirmed (Orly is seeking leave to appeal to the Court of Appeals); and (c) a state court lawsuit in which Orly

bizarrely seeks to hold Dalia liable for Judge Keenan's decision to release an escrow account to someone other than her.  Answr. Decl., Exhs. J, III, JJJ, KKK.

Brought to near financial ruin by all the legal fees defending her daughter's suits, on January 22, 2014, Dalia requested $200,000 from Sagi under the Oct. 30, 2004 Promise.  May 29 Sagi Decl., Exhs. C and D.  The next day, Sagi notified Orly and her lawyers of Dalia's demand, and his intention to honor his prior commitment to his mother.  *Id.*, ¶ 6; July 7 Sagi Decl., Exh. E, ¶ 11.  Thereafter, Sagi properly paid Dalia the $200,000.  Answr. Decl., Exh. A, Tr. 124:23-125:16.  When Sagi demanded from Orly one-half ($100,000) under the Nov. 10, 2004 Indemnity, Orly refused, denying the existence of the agreement altogether.  S*ee* May 29 Sagi Decl., Exh. E (Orly to Sagi:  "[S]top lying about me and about the history").  That denial has now seemingly been relegated to Orly's dustbin.  When compelled to state her position under oath, the most that Orly could muster was a half-hearted statement:  "I do not remember signing the November Document."  *See* Answr. Decl., Exh. L (1:14-cv-01006, Doc. 35 at 4).

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994).  A "genuine issue" of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  As Orly is the movant, she bears the burden to demonstrate that no genuine factual dispute exists, with all reasonable inferences drawn in Sagi's favor.  *Id.* at 255.  As follows, Orly has failed to satisfy her burden, and so her summary judgment motion should be denied.

II.     **THE NOV. 10, 2004 INDEMNITY IS SUPPORTED BY
        THREE FORMS OF CONSIDERATION**

In her Memorandum of Law ("Mem."), Orly maintains that the Nov. 10, 2004 Indemnity

"does not identify any consideration between Orly and Sagi."  Mem. at 5.  That is false.  The

Nov. 10, 2004 Indemnity explicitly cross-references and attaches the Oct. 30, 2004 Promise, in

which Sagi agrees to financially support Dalia in exchange for shares funded into trusts

established for Sagi's and Orly's benefit.  Answr. Decl., Exhs. AAA and BBB.  The Nov. 10,

2004 Indemnity thus expressly identifies <u>two</u> forms of consideration, with a third implicit, each

of which renders the Nov. 10, 2014 Indemnity fully enforceable.

A.     **Sagi Suffered a Detriment, Which Alone Constitutes
       Sufficient Consideration for the Nov. 10, 2004 Indemnity**

*First*, consideration for the Nov. 10, 2014 Indemnity is amply provided by the detriment

Sagi incurred thereunder.  To find support for the Nov. 10, 2004 Indemnity, this Court need not

become entangled in the thicket of litigation history.  Based on Orly's verbal commitment, which

she thereafter reduced to writing in the Nov. 10, 2004 Indemnity, Sagi committed to financially

support Dalia pursuant to the Oct. 30, 2004 Promise.  As explained by the Court of Appeals in

*Holt v. Feigenbaum*, 52 N.Y.2d 291, 296-300 (1981), the "dual notion of consideration as either

a benefit to the promisor *or* a detriment to the promisee has persisted [from seventeenth century

English common law in *Slade's Case* . . .] to the present day and has become an integral part of

our modern approach to the enforceability of contracts."  The Court of Appeals added:

> Far from consideration needing to be coextensive or even proportionate, the
> value or measurability of the thing forborne or promised is not crucial so long as
> it is acceptable to the promisee.  Thus, courts have not hesitated to find
> sufficient consideration not only in what is now the proverbial peppercorn . .
> ., but in 'a horse or a canary, or a tomtit if [the promisee] chose' . . . In fact,
> the detriment suffered or the thing promised need be of no benefit to the one who
> agreed to it.

*Id.*; *see also Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464-65 (1982); *Hollander v. Lipman*, 65 A.D.3d 1086, 1087 (2d Dep't 2009) ("[f]ind[ing] that the Supreme Court erred in concluding, as a matter of law, that the alleged April 1995 oral agreement between the defendant's decedent . . . and his late daughter was not supported by consideration because it did not benefit the decedent [because] [t]he fact that the decedent's daughter agreed to suffer a detriment provided sufficient consideration to support the alleged agreement.").

Here, Orly does not dispute (she only fails to remember) her promise to reimburse Sagi for 50% of their mother's support, a promise upon which Sagi reasonably relied (given that it was coming from his own sister), and from which he suffered a detriment.  It would be unconscionable to force Sagi to support their mother on his own, when they both made a commitment to do so equally, and when the reason that Dalia needs the financial support is because Orly has depleted her mother's resources through endless, meritless lawsuits.

### B. The Orly Trust Received TRI Shares in 2004, Which Also Constitutes Consideration for the Nov. 10, 2004 Indemnity

*Second*, Orly's trust received TRI shares in 2004, which is an additional form of consideration she received for the Nov. 10, 2004 Indemnity.  Orly argues that the "TRI Shares could not serve as consideration because they already had been transferred <u>before</u> the November Document was executed" and it "was not created or executed until <u>after</u> the Divorce Stipulation was signed 'as of October 26, 2004.'"  Mem. at 10.  In other words, Orly believes she should get a free pass, because the economic benefit had already been conveyed when she physically signed the Nov. 10, 2004 Indemnity.  *Id*.  Orly's argument fails for several reasons.

First, as noted above, it is undisputed that Orly's written commitment in the Nov. 10, 2004 Indemnity is reflective of her earlier oral commitment, which was made before her trust received those shares.  Second, and in any event, <u>the Stipulation of Settlement was held in</u>

escrow and was not converted into a binding Divorce Judgment until nearly two months later, on January 7, 2005. Answr. Decl., Exh. G. In New York, a divorce case is not final until a Court says it is. As of November 2004, the Gengers' case was still very much alive.

Third, the parties' agreement was only executed in two parts because on October 30, 2004 – the closing date of the Divorce Stipulation – Orly was in the middle of the Pacific Ocean. Answr. Decl., Exh. A, Tr. 30:8-30:18, 43:18-43:22; Exh. H at 0008-0010; Parnes Decl., ¶ 5. Prior to her departure, however, and then again on her trip (by satellite phone), Orly agreed with Sagi to split any monies paid to Dalia under the clawback, but the Oct. 30, 2004 Promise had Sagi assuming the entire obligation so that the closing could be completed without Orly's physical presence. *See* July 7 Sagi Decl., Exh. E, ¶¶ 3-6. Sagi only did so because Orly had verbally agreed to reimburse him for 50% of any monies paid to Dalia. *Id.*; *see also* Parnes Decl., ¶ 7. Sagi therefore signed the Oct. 30, 2004 Promise with Dalia, and then when Orly returned to New York, she executed the Nov. 10, 2004 Indemnity to memorialize her existing oral agreement with Sagi. *See* July 7 Sagi Decl., Exh. E, ¶¶ 6-8; *see also* Parnes Decl., ¶¶ 8-9.

"Under New York law, all writings forming part of a single transaction are to be read together." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). Here, the Oct. 30, 2004 Promise and the Nov. 10, 2004 Indemnity are plainly part of a single transaction, as the latter attaches and cross-references the former. *See Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002) ("Applying New York law, we have found that '[p]arties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements'") (internal citations omitted); *Trade Wind Distribution, LLC v. Unilux Ag*, 2011 WL 4382986, at *3 (E.D.N.Y. Sept. 20, 2011) (determining that the parties intended separate terms and conditions to be part of a contract when it was referenced in the

contract several times); *BWA Corp. v. Alltrans Express U.S.A., Inc.*, 112 A.D.2d 850, 852 (1985) (where, since a letter-agreement expressly referred to a sublease and was executed contemporaneously, two documents should be treated as one instrument).

The fact that the Nov. 10, 2004 Indemnity was signed a few days after the Oct. 30, 2004 Promise does not change this basic precept of law. *See, e.g.*, *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49 (2d Cir. 1993) ("Even if the writings are executed at different times, . . . contracts should be interpreted together if 'the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken.'") (quoting 6 WILLISTON, *Contracts*, § 863 at 275 (3rd ed. 1970)); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965) ("[I]t is both good sense and good law that these closely integrated and <u>nearly contemporaneous</u> documents be construed together.") (emphasis added); *Kurz v. United States*, 156 F. Supp. 99, 104 (S.D.N.Y. 1957)), *aff'd*, 254 F.2d 811 (2d Cir. 1958) (New York law is flexible on "time lapse between instruments" because "where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together, even though they do not expressly refer to each other"); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941) (where contracts "were executed at substantially the same time, [and] related to the same subject matter, [they] were contemporaneous writings and must be read together as one").

Indeed, in the *Commander Oil Corp.* decision cited by Orly, the Second Circuit made clear that the issue of "whether separate documents executed simultaneously should be treated as a single contract is governed by the intent of the parties manifested at the time of contracting and viewed in light of all the surrounding circumstances." *Dynamics Corp. of Am. v. Int'l Harvester Co.*, 429 F. Supp. 341, 345-46 (S.D.N.Y. 1977); *see also In re Teligent*, 268 B.R. 723, 728-29

(Bankr. S.D.N.Y. 2001) (construing contemporaneously executed merger agreement and non-compete and non-disclosure agreements together as single contract because neither agreement would have been executed without the other).   Here, Sagi has provided sworn testimony as to his intent as a party to the Nov. 10, 2004 Indemnity, to which Orly has only responded with a specious claim of "forgery," followed by an equally specious claim of amnesia. Thus, all of the evidence from the parties points to the same conclusion – that the Oct. 30, 2004 Promise and the Nov. 10, 2004 Indemnity "form part of a single transaction and are designed to effectuate the same purpose [and must] be read together.'"   *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (quoting *This is Me, Inc.*, 157 F.3d at 143).

Indeed, because the law on this point is so clear-cut, Orly is left to argue a straw-man defense.   Namely, she contends that the Nov. 10, 2004 Indemnity is not interrelated <u>with the Oct. 30, 2004 Divorce Stipulation</u>.   *See* Mem. at 13-16.   But that is not the claim in the Complaint.   Rather, Sagi contends that that the Nov. 10, 2004 Indemnity is interrelated <u>with the Oct. 30, 2004 Promise</u>.   *See* Answr. Decl., Exh. EE (Compl. ¶¶ 17-18) ("Plaintiff performed all of his obligations under the Oct. 30, 2004 Promise. . . . As part of the same overall agreement, Plaintiff and Defendant entered into the related Nov. 10, 2004 Indemnity.").   As Orly cannot deny the interrelationship between the Nov. 10, 2004 Indemnity and the Oct. 30, 2004 Promise annexed thereto and incorporated by reference, her motion fails on this ground as well.

### C.    Orly Received an Additional Benefit in the Form of Peace by Ending a Protracted Family Dispute

*Third*, in consideration for Orly's promise to reimburse Sagi for 50% of monies paid to Dalia under the Oct. 30, 2004 Promise, Orly also received an emotional and psychological benefit in helping to end her parents' bitter divorce battle and achieve familial peace.   As Orly herself has testified, "I definitely had a desire for the divorce to be over with . . . [b]ecause it was

a horrible period." *See* Answr. Decl., Exh. K, Tr. 39:11-39:19. While Orly disparages this as mere generic "love and affection," clearly it was quite a lot more than that.

This benefit, in and of itself, constitutes consideration even absent a financial kicker. New York law "recognizes other forms of legitimate consideration, including nonmonetary consideration." *Comm. Futures Trading Comm'n v. Walsh*, 17 N.Y.3d 162, 175-76 (2011) (listing examples of non-economic consideration); *see also Comm. Futures Trading Comm'n v. Walsh*, 3 F. Supp. 3d 70, 77 (S.D.N.Y. 2014) (supporting and raising children is valid and valuable consideration). Indeed, there are "myriad types of consideration that arise in the unique context of marital dissolution." *Durand v. Ackerman*, 2010 WL 3834587, at *7 (E.D.N.Y. Bankr. Sept. 27, 2010) (citation omitted); *see also In re Cersosimo*, 2009 WL 3182989, at *4 (E.D.N.Y. Bankr. Sept. 29, 2009); *Darling v. Darling*, 22 Misc. 3d 343, 358-59 (Sup. Ct. Kings Cnty. 2008). Separate from mere "love and affection", "a desire to preserve family harmony" has been long recognized as valid consideration in the contacts of familial contracts. *Bunn v. Bartlett*, 8 N.Y.S. 160, 161-62 (Gen. Term 1889). Moreover, the New York Court of Appeals has found "general peace" as a consideration of which "there can be no mutual mistake." *Mangini v. McClurg*, 24 N.Y.2d 556, 566 (1969). Orly did not agree to the deal for her brother's love, but rather for her own "desire" to end "a horrible period" and facilitate peace. For that reason, Orly's "love and affection" cases are inapposite.

## III.   JUDICIAL ESTOPPEL DOES NOT BAR SAGI'S CLAIMS

Orly argues that her trust's receipt of TRI shares cannot serve as consideration because, in recent years, "Sagi has repeatedly acted, and argued to the courts including this one, that neither Orly nor the Orly Trust ever received any TRI shares," and is therefore supposedly estopped under Judge Keenan's May 15, 2014 decision. Mem. at 5-6. Orly took the opposition

-11-

position, that nothing after 2004 matters, just a few weeks ago, when she successfully fended off discovery into these very matters. In any event, that is not what Sagi argued, nor what Judge Keenan decided. To fully appreciate the extent to which Orly has made mincemeat of the prior litigation rulings, however, a short digression is unfortunately required.

### A.    Litigation Backdrop

In 1985, Arie Genger founded Trans-Resources, Inc. ("TRI"), a Delaware corporation that manufactures and distributes fertilizer, as a wholly-owned subsidiary of a holding company, TPR Investment Associates, Inc. ("TPR"), all of whose stock was directly owned by or held in trust for Arie, his wife Dalia, his son Sagi, and his daughter Orly. Answr. Decl., Exh. J (*Genger v. Genger*, 121 A.D.3d 270, 274 (1st Dep't 2014)). By 2001, TRI had run into financial difficulty. *Id.*, Exh. M (*Glenclova Inv. Co. v. Trans-Res., Inc.*, 874 F. Supp. 2d 292, 295 (S.D.N.Y. 2012)). To save the company from bankruptcy, Arie approached his friends, Jules and Eddie Trump, who organized a group of investors (the "Trump Group") to purchase the vast majority of TRI's outstanding bonds at a substantial discount. *Id.*

On March 31, 2001, the Trump Group entered into a Stockholders Agreement with TRI and TPR, pursuant to which the Trump Group converted their bond holdings into a 47.15% equity stake in TRI. *Id.* TPR, which was controlled by Arie, retained 52.85%. *Id.* at 295-96. Importantly, the Stockholders Agreement prohibited either party from transferring their shares in TRI to anyone besides a limited number of permitted transferees, and required written notice prior to any transfer. *Id.* at 296. Violation of the terms of the Stockholders Agreement gave non-selling shareholders the right to purchase any invalidly transferred shares. *Id.*

In October 2004, in connection with their Divorce Stipulation, Arie caused TPR to transfer to Arie personally and to two Genger family trusts all of the Genger family's TRI stock

holdings.  *Id.*, Exh. J (*Genger*, 121 A.D.3d at 275).  In particular, TPR transferred 1,102.8 shares of TRI (approximately 19.5% of the company) to each of two trusts set up for the benefit of Sagi and Orly and their progeny:  the Sagi Genger 1993 Trust (the "Sagi Trust") and the Orly Genger 1993 Trust (the "Orly Trust").  *See id.*, Exh. N (Divorce Stipulation, Article II at 12-14); *see also* Exh. M (*Glenclova Inv. Co.*, 874 F. Supp. 2d at 296).  Arie represented to his family members that no further consents were required to transfer the TRI stock.  *Id.*; *see also* Exh. N.

It is undisputed that, between 2004 and 2008, the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.  Answr. Decl., Exh. X ¶ 66 (iii).  No Court has ever held otherwise.  In Spring 2008, however, the Trump Group learned of Arie's 2004 TRI share transfers and invoked its right under the 2001 Stockholders Agreement to purchase all of the TRI shares that Arie had transferred to himself, the Sagi Trust, and the Orly Trust in 2004.  *Id.*, Exh. J (*Genger*, 121 A.D.3d at 276).

On August 11, 2008, the Trump Group filed suit against TPR in this Court to enforce the TRI Stockholders Agreement.  *Id.* (citing *Glenclova Inv. Co. v. Trans-Resources, Inc.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y. Aug. 11, 2008)).  By 2008, Sagi had become President of TPR.  Sagi caused TPR to settle with the Trump Group.  As part of that settlement, TPR and the Trump Group executed a August 22, 2008 Letter Agreement giving the Trump Group an option to purchase, *inter alia*, the TRI shares transferred to the Orly Trust, should a court void the 2004 transfers.  *Id.*, Exh. YY at ¶ 2.  It provides:

> In connection with the transactions contemplated by the Purchase Agreement**, if at any time following the Closing Date, it is determined that** Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that **Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is the record *or* beneficial owner of any such shares**, in either or both cases by virtue of the

-13-

> transfer of such shares being deemed to have been void or for any other reason . . . then (a) upon written request from the Purchasers, TPR shall promptly take all necessary action to effect the transfer of all Affected Shares . . . to the Purchasers in the same proportion as the Shares are being sold to them pursuant to the Purchase Agreement, for a price per share equal to … the value of each Affected Share at the time of the October 2004 purported transfers (the 'Transfer Date') based upon an aggregate value for all of the issued and outstanding shares of Common Stock of the Company of $55,000,000 . . . .

*Id.* at ¶¶ 2-3 (emphases added).

The Trump Group thereafter filed suit against Arie Genger in the Delaware Chancery Court for a determination as to which stockholder group controlled TRI.  *Id.*, Exh. M (*Glenclova Inv. Co.*, 874 F. Supp. 2d at 296).  In an opinion dated August 9, 2010, the Delaware Chancery Court held that the 2004 transfers of TRI shares to the Orly Trust were invalid, that both record and beneficial ownership of those shares had reverted back to the seller, TPR, and that under the August 22, 2008 Letter Agreement between the Trump Group and TPR, the Trump Group had the option to buy that stock.  *Id.*, Exh. S (*TR Investors, LLC v. Genger*, 2010 WL 3279385, at *3 (Del. Ch. Aug. 9, 2010), *rev'd*, 26 A.3d 180 (Del. 2011)).

Arie appealed the Chancery Court's ruling.  *See id.*, Exh. T (*Genger v. TR Investors, LLC*, 26 A.3d 180, 189 (Del. 2011)).  The Delaware Supreme Court then affirmed the finding that TPR was the <u>record</u> owner of the TRI shares transferred to the Orly Trust.  *Id*. at 200 ("[W]e affirm the judgment of the Court of Chancery insofar as it determines the *record* ownership of the disputed Trans-Resources shares in the Side Letter Opinion and the Final Judgment Order.").  However, it <u>reversed</u> the Chancery Court's August 9, 2010 Side Letter Opinion "to the extent it adjudicates the beneficial ownership of the Orly Trust Shares," ruling that the Chancery Court lacked the power to declare who <u>beneficially</u> owned the shares transferred to the Orly Trust because it lacked personal jurisdiction over that party.  *Id.*; *see also* Answr. Decl., Exh. J (*Genger*, 26 A.3d at 201-203).

-14-

Promptly thereafter, the Delaware Chancery Court entered a Revised Final Judgment Order that reflected and implemented the rulings of the Delaware Chancery Court and the Supreme Court.  *See* Answr. Decl., Exh. U (Final Order (Del. Ch. Ct. Aug. 19, 2011)).   It provided that TPR is the "record owner of all [TRI] shares not presently owned" by the Trump Group, and that Arie and the Orly Trust "are not and have not been since at least the date of execution of the Stockholders Agreement the record owners of any [TRI] shares." *Id.*, ¶¶ 2-8 (emphases added).   The Final Judgment Order did not purport to strip the Orly Trust of its beneficial ownership of the TRI shares.  *Id.*   No appeal was taken by any party.

While this matter was being litigated in Delaware, in 2010 Orly (on behalf of the Orly Trust) brought an action in New York State Supreme Court against Sagi, Dalia, the Trump Group, and various others.   The gravamen of her claims was that the Orly Trust retained its beneficial interest in the TRI shares transferred to the Orly Trust in 2004.   Answr. Decl., Exh. X (Third Amended Complaint filed in *Arie Genger & Orly Genger v. Sagi Genger, et al.*, No. 651089/2010 (Sup. Ct. N.Y. Cnty.)).   Three years later, Orly settled her claims against the Trump Group.   Her own attorney and one for the Trump Group have both stated that Orly received consideration in the settlement.  *See* Answr. Decl., Exhs. MM and GG.

On June 19, 2013, Orly and the Trump Group executed a Stipulation and Order of Discontinuance with Prejudice, stating:  "It is hereby declared that the Trump Group own, for all purposes, all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources, Inc. purportedly transferred by TPR Investment Associates, Inc. in October 2004 to Arie and the Orly Genger 1993."  Answr. Decl., Exh. Y (No. 651089/2010, NYSCEF Doc. No. 471 at 2 (N.Y. Sup. Ct. N.Y. Cnty. June 19, 2013) (emphasis added)).

-15-

As part of that same settlement, Orly further agreed to "'cooperate' and 'cause' the Orly Trust to release any and all claims against [t]he Trump Group." Answr. Decl., Exh. JJ, ¶ 4. That was significant because in 2011, Dalia, as trustee of the Orly Trust, had filed a plenary action in Delaware Chancery Court against the Trump Group and TPR seeking a declaratory judgment that the Orly Trust is the beneficial owner of the TRI shares. *See Dalia Genger v. TR Investors, LLC, et al.*, C.A. No. 6906-CS (Del. Ch.). Chancellor Leo Strine, however, had stated that "he would not proceed without knowing Orly's position" because he found it "weird" that a trustee (Dalia) would proceed without the support of the trust's "adult beneficiary" (Orly). *See* Answr. Decl., Exh. GG at 42:18-43:20. The Chancery Court elicited Orly's position. Orly, in turn, advised the Court that she was "acknowledg[ing] individually and in her capacity as the beneficiary of her trust that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust." *See* Answr. Decl., Exh. MM.

Satisfied that Orly no longer wanted her trust to pursue ownership over the TRI shares, the Delaware Court dismissed her trust's claims with prejudice and so-ordered a Stipulation of Dismissal from the Orly Trust. *See id.*, Exh. HHH. In it, the Orly Trust's declaratory judgment claim was "dismissed with prejudice," the 2004 transfer of the TRI shares to the Orly Trust was deemed "void and the stock reverted to TPR," and the Trump Group were held to be beneficial owners of the shares "pursuant to and under the terms of the Side Letter Agreement between TPR and the Trump Group entered into in August 2008." *Id.*, Exh. HHH, ¶¶ 1-2, 4.

This brings us to the case before Judge Keenan. Under the August 22, 2008 Letter Agreement, the Trump Group has the option to purchase, for about $10.3 million, TPR's record *or* beneficial ownership of the TRI shares which had been transferred to the Orly Trust in 2004 . Answr. Decl., Exh. AA (*TPR Inv. Associates, Inc. v. Pedowitz & Meister LLP*, 2014 WL

1979932, at *2 (S.D.N.Y. May 15, 2014)).  Because of the contingent nature of the transaction, all parties agreed that the sale proceeds (the "Proceeds") would be held in escrow until the Delaware litigation was over.  *Id.*  In November 2013, after the end of all Delaware proceedings, TPR brought an action to release the Proceeds held in escrow pursuant to the Escrow Agreement. Answr. Decl., Exh. BB (*TPR v. Pedowitz & Meister LLP*, No. 13 CIV. 8243).

TPR never disputed Orly's receipt of TRI shares in 2004.  Answr. Decl., Exhs. BB, CC, and DD (Complaint, Memorandum of Law in Support of Summary Judgment, Reply Memorandum of Law in Support of Summary Judgment filed in the Federal Escrow Action). Instead, TPR moved for summary judgment on the basis that Orly forwent any claim she had to record or beneficial ownership therein by stipulating in 2013 to the Trump Group's ownership, and by causing the Orly Trust to do the same.  There was no confusion on this point.  TPR's position was properly understood and summarized by Judge Keenan:

> **The beneficial ownership issue is now dead; Orly has settled with the Trump Group**.  Therefore, TPR argues, it is now entitled to the Proceeds it received from the Trump Group in consideration for those shares. . . .

Answr. Decl., Exh. AA (*TPR Inv. Assoc's.*, 2014 WL 1979932, at *3, *5 (emphasis added)).

On May 15, 2014, Judge Keenan issued an Opinion and Order granting summary judgment to TPR, finding that Orly had stipulated away her and her Trust's rights to the TRI shares to the Trump Group, as follows:

> … **Orly and the Trump Group have settled their claims against each other.  Pursuant to that settlement, Orly acknowledged that the Trump Group is the record and beneficial owner of the Orly Trust Shares.** . . . **At long last, the dispute regarding ownership of the Orly Trust Shares is over.** . . . **Orly has relinquished her claim to the shares as part of her settlement with the Trump Group.** . . . **The beneficial ownership issue is now dead; Orly has settled with the Trump Group.**

*Id.*, at *2-*3, *5 (emphases added).  In other words, Orly sold her trust's rights to the TRI shares

at issue, and so could make no claim on the Proceeds.   That said, she obtained a payment attributable to those shares, direct from the Trump Group.

### B.    The 2004 Transfers Were Never Determined to Be Void *Ab Initio*

"[J]udicial estoppel may be applied to bar a party from asserting a factual position in a given proceeding only when that party advanced a clearly inconsistent position in a prior proceeding and that inconsistent position was adopted by the court in some manner, . . . perhaps, for example, by obtaining a judgment." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir. 1997).   "When any of these elements are missing, judicial estoppel does not apply." *Id.*   It is well-settled that "[j]udicial estoppel does not apply unless the party 'advanced a clearly inconsistent position in a prior proceeding and that inconsistent position was adopted by the court in some manner.'" *Decker v. Vermont Educ. Television, Inc.*, 13 F. Supp. 2d 569, 573 (D. Vt. 1998) (citing *Maharaj*, 128 F.3d at 98).

Here, judicial estoppel does not apply because <u>Sagi has never disputed that the Orly Trust received the TRI shares in 2004 when the Nov. 10, 2004 Indemnity was signed.</u>   No court has ever issued a binding ruling that the Orly Trust did not receive TRI shares in 2004.   (Indeed, as noted above, the Delaware Supreme Court sided with the Orly Trust.)   Rather, as Judge Keenan noted in the May 15, 2014 Opinion, the Orly Trust's beneficial ownership was a "dead" issue in 2014 only because she stipulated her rights thereto to the Trump Group in 2013.   *See* Answr. Decl., Exh. AA (*TPR Inv. Associates, Inc.*, 2014 WL 1979932, at *3, *5 ).

Orly falsely asserts that "[b]y the time of Dalia's 'demand' in 2014, the transfers had been determined to be void <u>ab</u> <u>initio</u>, with Sagi (via TPR) obtaining all the value — and Orly none." Mem. at 3.   This statement is false in every respect.   First, the 2004 transfer to the Orly Trust was never determined to be void <u>ab</u> <u>initio</u>.   While the Trump Group took that position in its

-18-

Delaware lawsuit (Answr. Decl., Exh. T (*Genger*, 26 A.3d at 187)), it did not ultimately <u>prevail</u> on that point.  While the original opinion from the Chancery Court (cited by Orly) held that "the transfers were void [and] the purportedly transferred shares continued to be owned by TPR," *see id.*, Exh. S (*TR Investors, LLC*, 2010 WL 3279385, at *3), Orly neglects to point out that, after the decision was <u>reversed</u> on appeal, on remand, the Chancery Court entered a "Revised Final Judgment Order," which struck the above language and replaced it with this:  "[T]he transfers were void [and] the purportedly transferred shares continued at all times to be owned <u>of record</u> by TPR." *Id.*, Exh. U (Revised Final Judgment Order in *TR Investors, LLC et al. v. Arie Genger et al.*, C.A. No. 3994-VCS, ¶ 12 (Del. Ch. Ct. Aug. 19, 2011)).

As noted above, beneficial ownership of those shares continued to be held by the Orly Trust until 2013, when Orly sold away beneficial ownership of those shares to the Trump Group, and caused her trust to do the same, in exchange for cash for herself.  *See* Answr. Decl., Exh. Y (No. 651089/2010, NYSCEF 471 at 2 (N.Y. Sup. Ct. N.Y. Cnty. June 19, 2013)).

Since TPR's litigation position and Justice Keenan's decision were both based on Orly's own lucrative cash settlement with the Trump Group in 2013, and not on anything that happened in 2004, and since TPR is not Sagi in any event, the doctrine of judicial estoppel does not apply here.  No inconsistent positions were taken, nor inconsistent decisions procured.  The Orly Trust's receipt of beneficial ownership to the TRI shares in 2004 (which Orly sold in 2013) is consideration supporting the Nov. 10, 2004 Indemnity.

Finally, even were Orly correct that neither she nor her trust received payments attributable to the TRI shares, under the plain terms of the Nov. 10, 2004 Indemnity she is still responsible for 50% of the financial commitment thereunder, because – as she freely admits the (Mem. at ¶ 22 – the Sagi Trust received such payments.  Answr. Decl., Exh. BBB.

IV.   **THE DIVORCE STIPULATION'S INTEGRATION CLAUSE**
      **DOES NOT BAR SAGI'S CLAIMS**

Orly next argues that because of the "Entire Understanding Clause" in the Divorce Stipulation, "Dalia is legally precluded from claiming that Orly's indemnification was part of the consideration for her divorce." *Id.* This argument is contradicted by the plain language of the very integration clause that Orly cites, which provides that:

> This Agreement contains the entire understanding ***of the parties*** who hereby acknowledge that between them there have been and are no representations, warranties, covenants or undertakings (whether written or oral, express or implied) with respect to the subject matter hereof including, without limitation, all rights or claims arising at law, in equity or pursuant to the parties' marital relationship ***other than those expressly set forth herein or in the transaction contemplated hereby or entered into concurrently herewith***.

Answr. Decl., Exh. N (Divorce Stipulation, Art. XXI) (emphases added). Only Arie and Dalia are "parties" to the Divorce Stipulation. Sagi and Orly are not. Thus, any commitments Dalia and Arie made to each other on October 30, 2014 did not prevent Orly from thereafter making further contractual commitments on her own behalf.

Second, the Divorce Stipulation further provides that "no third person shall be deemed to have been given any interest or right hereunder." *Id.*, Exh. N (Divorce Stipulation, Art. XIX(4)). Thus, Orly cannot claim any rights as a third-party beneficiary thereunder.

Third, the "Entire Understanding" clause contains an express carve-out for agreements such as the Oct. 30, 2004 Promise, which was, as explained above, "entered into concurrently" with the Divorce Stipulation. *See id.*

Lastly, Orly cannot help but once again try to play to the Court's sympathies by falsely and outrageously suggesting that she has been "pauperized." *See* Mem. at 1. First, Orly is wealthy in her own right. (For example, her artwork sells for as much as $25,000 per piece. Answr. Decl., Exh. LLL (noting the sale of "Stack")) Further, as Your Honor will recall, Sagi

sought production of Orly's settlement agreement with the Trump Group in order to show that, aside from her personal asses, Orly made millions of dollars from the very bequest which she now falsely claims was consideration-free.   Orly defeated this motion by arguing in an October 3, 2014 letter from her counsel to Court (Doc. No. 25) that:  "The observation by Orly counsel in a brief that this litigation is 'just one of many schemes to pauperize Orly' …  is neither a claim nor a defense.  It is not even evidence."  Yet here she is, at it again, making the same bilious, defamatory claim she admitted was "entitled to no evidentiary weight."  *Id.*  Either such remarks should be struck from the docket, or else the Court should revisit its October 7, 2014 discovery decision in light of the clear bad faith that is now on display.

## V.     ANY MUTUAL MISTAKE OF FACT DOES NOT RENDER THE NOV. 10, 2004 INDEMNITY UNENFORCEABLE

Orly further claims that the Nov. 10, 2004 Indemnity is "subject to recession because it is based upon a mutual mistake of fact"; specifically, that the "transfers were determined to be void <u>ab</u> <u>initio</u>."  Mem. at 17-18.  As noted above, Orly is not entitled to this equitable defense because she <u>voluntarily surrendered</u> any rights that she might have otherwise had in the TRI shares to the Trumps by settling with them for an amount of money, and then transferring money to them. Answr. Decl., Exh. AA (*TPR Inv. Associates, Inc.*, 2014 WL 1979932, at *3, *5).   Orly now seeks a double recovery by attempting to undo the Nov. 10, 2004 Indemnity, based on a legal and factual finding that she deliberately procured in exchange for a large cash payment.  Further, and in any event, the Nov. 10, 2004 Indemnity would still be enforceable based on the detriment Sagi suffered and Orly's benefit in ending her family's dispute, as explained above.

New York law recognizes "a heavy presumption that a deliberately prepared and executed written instrument [manifests] the true intention of the parties."  *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 577 (1986) (citation omitted); *see also Torrence v. Hastings*, 178 A.D.2d

803, 805 (3d Dep't 1991) (affirming summary judgment on mutual mistake claim where a party did not present "high order of evidence" to "overcome the heavy presumption that the signed agreements evidenced the intent of the parties").   Critically, a possibility, likelihood, or even "probability" of mistake cannot, as a matter of law, justify reformation of a contract.  *Ross v. Food Specialties, Inc.*, 6 N.Y.2d 336, 341 (1959); *Amex Assurance Co. v. Caripides*, 179 F. Supp. 2d 309, 321 (S.D.N.Y. 2002), *aff'd*, 316 F.3d 154 (2d Cir. 2003).   Rather, a "'mutual mistake must be established by clear and convincing evidence.'"  *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002) (citation omitted).   Most importantly, "a 'poor prediction of events that are expected to occur' is not a mistake of fact" that supports an equitable defense of mutual mistake.  *Bd. of Trustees of Sheet Metal Workers Local Union No. 137 Ins. Annuity v. Vic Constr. Corp.*, 825 F. Supp. 463, 467 (E.D.N.Y. 1993).

This Court should not allow Orly to misuse this equitable defense to further profit from her own stipulation of the facts with the Trump Group, or base a mutual mistake defense upon a "poor prediction" in 2004 of the Trump Group's future business relationship with Arie, TRI, and TPR in 2008 and beyond.   Indeed, Orly cites no cases concerning a mutual mistake defense with respect to consideration that one of the parties voluntarily decided to stipulate away years later, or that a hostile takeover occurred after a business relationship turned sour.

## VI.   ORLY HAD NO RIGHT TO DEFEND AGAINST DALIA'S CLAIM

Lastly, Orly argues that she, as an indemnitor, has no contractual duty to indemnify without first receiving notice and a chance to defend.  This argument fails for three reasons. *First*, there is no viable defense that Sagi could truthfully have asserted to Dalia's payment demand.  Neither Sagi nor Dalia is feigning amnesia, or crying "forgery," or pretending there is no consideration.  *See* July 7 Sagi Decl., Exh. E, ¶¶ 8-12; Dalia Decl., Exh. F, ¶ 2.   Under

New York law, no notice to Orly is required where, as here, the indemnitee can "establish that [it] would have been liable and that there was no good defense to the liability." *Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust*, 74 A.D.3d 32, 39 (1st Dep't 2010). As Sagi plainly owed Dalia the money, he was right to pay it. He would have been wrong to stiff her.

*Second*, and in any event, the Nov. 10, 2004 Indemnity is not a traditional indemnity obligation, like an insurance contract, pursuant to which Orly agreed to cover a particular type of claim. *See, e.g.*, *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 1994 WL 164057, at *2 (S.D.N.Y. Apr. 21, 1994) (traditional indemnity is where "the party seeking indemnification [seeks] it for amounts paid in settlement of a legal claim asserted by a third party"). The Nov. 10, 2004 Indemnity is more akin to a contribution obligation – a duty to reimburse Sagi for 50% of any amount that Sagi paid to Dalia in accordance with the Oct. 30, 2004 Promise.

*Third*, even assuming, *arguendo*, that the Nov. 10, 2004 Indemnity grants Orly an absolute right to defend any claim made by Dalia under the Oct. 30, 2004 Promise, no matter how frivolous (and it does not), Orly still repudiated her Nov. 10, 2004 Indemnity on February 18, 2004 when, in reply to Sagi's follow-up request for reimbursement, she emailed him back telling him to "stop lying about me and about the history." May 29 Sagi Decl., Exh. E. Under New York law, one cannot repudiate a contract while simultaneously claiming a right to defend under that very same contract. *See Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 79 (1st Dep't 2002) (a party who repudiates a contract cannot claim right to enforce thereunder). By flatly and falsely proclaiming the Nov. 10, 2004 Indemnity to be a "lie" (as opposed to a truthful agreement which is unenforceable on technical legal grounds, as Orly now maintains in her summary judgment motion), Orly has forfeited any right she may have otherwise had to invoke the provisions thereof for her personal benefit.

## VII.   SAGI CAN ALSO ESTABLISH HIS EQUITABLE CLAIM
##        FOR PROMISSORY ESTOPPEL

Under New York law, promissory estoppel is an equitable doctrine that requires:  (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise was made; and (3) that the person to whom the promise was made relied upon the promise to his or her detriment.  *See Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 533 (S.D.N.Y. 2007) (citing *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir. 1986)); *see also* Restatement of Contracts 2d § 90; *Ciocca v. Neff*, 2005 WL 1473819, at *6 (S.D.N.Y. June 22, 2005).  Here, Sagi's claim for promissory estoppel is based upon a clear and unambiguous promise by Orly to reimburse Sagi for 50% of their mother's support, which Sagi reasonably relied upon, given that it was coming from his own sister and concerned their mother.

Orly maintains that "when Sagi paid Dalia $200,000 he was already aware that Orly disputed the validity and enforceability of the" Oct. 30, 2004 Promise and Nov. 10, 2004 Indemnity.  Mem. at 21.  This argument measures reliance from the wrong starting point.  The claim here is that Sagi relied on Orly's oral promise to share equally in the burden when he executed the Oct. 30, 2004 Promise to his mother.  Once he did so, it matters not that ten years later, Orly is now at odds with her mother.  The commitment was already made.

In any event, Orly's argument is belied by the very evidence upon which she relies.  Orly cites an email from one of her attorneys, Lance Harris, to Sagi's counsel, John Dellaportas on January 24, 2014, in which Mr. Harris asks for the "original of the documents" and "a copy of the Dalia demand" and states "[c]learly, the newly provided documents require review and consideration on our part."  *See* Declaration of Bryan Leinbach, dated October 20, 2014 ("Leinbach Decl."), Exh. 63.  Nowhere does Mr. Harris object to the Nov. 10, 2004 Indemnity.

Orly also relies upon a declaration submitted by Mr. Harris, in which he claims that "[b]etween this January 23, 2014 meeting and February 15, 2014, I had several telephone conversations with Sagi counsel John Dellaportas about the Sagi Promise Document and the November Document." *See* Leinbach Decl., Exh. 62 (Harris Decl., ¶ 5).  This is an old-fashioned lie.  According to the phone records, Mr. Harris did not "several telephone conversations," but rather only a single 3.8 minute telephone call on February 7, 2014 in which Mr. Dellaportas and he discussed another matter, not the laundry list of subjects identified in Mr. Harris's declaration.  *See* Answr. Decl., Exh. NN (Reply Declaration of John Dellaportas, dated July 7, 2014), ¶ 4 and Exh. D.  In sum, Sagi had no notice of Orly's objection when he paid under the Oct. 30, 2004 Promise.

Orly also claims that Sagi cannot rely on equitable claims because under his Presidency, TPR "promised to do all that was necessary to effectuate the transfer of TRI shares to his sister." Mem. at 21.  In its July 24, 2014 Opinion, the Appellate Division found that neither Sagi nor TPR breached any obligations to Orly or the Orly Trust in settling with the Trump Group, and dismissed all of Orly's claims against Sagi and TPR accordingly.  *See* Answr. Decl., Exh. J (*Genger*, 121 A.D.3d at 278-79, holding that the "loss of the TRI shares included in the marital assets was the result of [Arie's] false representation that TPR could transfer the shares without the Trump Group's consent" and his "unclean hands.").  Thus, as a matter of both collateral estoppel and *res judicata*, Orly is estopped from asserting that Sagi's execution of the August 22, 2008 Letter Agreement bars his claims here.  *See Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 2014 WL 2481904, at *10 (S.D.N.Y. June 2, 2014) (citation omitted).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Orly's motion for summary judgment should be denied in its entirety, and summary judgment should instead be granted to Sagi.

Dated:       New York, New York
              November 14, 2014

                                   Respectfully submitted,

                                   MORGAN, LEWIS & BOCKIUS LLP


                                 By:       */s/ John Dellaportas*
                                     John Dellaportas
                                     Nicholas E. Schretzman
                                     Mary C. Pennisi
                                     101 Park Avenue
                                     New York, New York 10178-0060
                                   *Attorneys for Plaintiff Sagi Genger*