UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

SAGI GENGER,

                          Plaintiff,

    -v-

ORLY GENGER,

                       Defendant.

-------------------------------------------------- X

No. 14-cv-5683 (KBF)

Hon. Katherine B. Forrest

 

**DEFENDANT ORLY GENGER'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO VACATE THE AMENDED JUDGMENT PURSUANT TO FRCP 60**

 

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019

*Attorneys for Defendant Orly Genger*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................... 1

RELEVANT FACTS ................................................................................................... 4

A.   Sagi's Summary Judgment Motion Relied On The Authenticity Of The
     Indemnification Letter .................................................................................... 4

1.   The Disputed Testimony About The Letter .................................................. 5

2.   Sagi Used The Parnes Declaration To Authenticate The Letter And To
     Corroborate His Testimony ........................................................................... 5

3.   The Court's Decision Relied On The Parnes Declaration ............................ 6

B.   The State Fraud Trial Revealed The Falsity Of The Parnes Declaration ........... 6

1.   Sagi Tried To Suppress Discovery Of The Falsehood .................................. 7

2.   Parnes' Testimony At His Court-Ordered Deposition Contradicted His Declaration
     In Material Respects ...................................................................................... 9

3.   Newly Discovered Parnes Documents Undermine The Integrity And Fairness
     Of The Final Judgment .................................................................................. 13

ARGUMENT ............................................................................................................. 16

I.   THE JUDGMENT SHOULD BE VACATED BECAUSE SAGI KNOWINGLY
     PRESENTED FALSE EVIDENCE .............................................................. 16

II.  NEWLY DISCOVERED EVIDENCE FURTHER WARRANTS
     RELIEF FROM THE JUDGMENT .............................................................. 20

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abildgaard v. Brulle,*
  2014 WL 5801837 (Civ. Ct. N.Y. Cty. Nov. 6, 2014)............................................................18

*Berry v. Dep't of Corrections,*
  No. 93 Civ. 6448 (BSJ), 2004 WL 287666 (S.D.N.Y. Feb. 11, 2004)................21, 22, 23, 24

*Carroll v. LeBoeuf, Lamb, Greene & MacRae, L.L.P.,*
  614 F. Supp. 2d 481 (S.D.N.Y. 2009) (Kaplan, J.).............................................................17

*Catskill Development, L.L.C. v. Park Place Entertainment Corp.,*
  286 F. Supp. 2d 309 (S.D.N.Y. 2003) (McMahon, J.)................................................16, 18, 20

*Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc.,*
  613 F. Supp. 1052 (S.D.N.Y. 1985)....................................................................................24

*Kearsey v. Williams,*
  No. 99 CIV. 8646 (DAB), 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004)...........................16

*Kurzweil v. Philip Morris Co., Inc.,*
  No. 94-Civ-2373 (MBM), 1997 WL 167043 (S.D.N.Y. Apr. 9, 1997)...........................21, 23

*Lonsdorf v. Seefeldt,*
  47 F.3d 893 (7th Cir. 1995) ................................................................................................19

*Mayimba Music, Inc. v Sony Corp. of Am.,*
  12 CIV. 1094 AKH, 2015 WL 6917260 (S.D.N.Y. Apr. 30, 2015)......................................23

*Mayimba Music, Inc. v Sony Corp. of Am.,*
  12 CIV. 1094 AKH, Docket No. 195 (S.D.N.Y. Aug. 18, 2014)..........................................23

*Nemaizer v. Baker,*
  793 F.2d 58 (2d Cir. 1986)..................................................................................................16

*Ope Shipping, Ltd. v. Underwriters at Lloyds,*
  100 F.R.D. 428 (S.D.N.Y. 1983) ...................................................................................21, 22

*Pro Bono Investments, Inc. v. Gerry*,
No. 03-cv-4347 (JGK), 2005 WL 2429777 (S.D.N.Y. Sept. 30, 2005) .................................17

*In re Puda Coal Sec., Inc. Litig.*,
No. 11 Civ. 2598 (KBF), 2014 WL 715127 (S.D.N.Y. Feb. 21, 2014) (Forrest, J.) ..............20

*Samuels v. Health & Hosp. Corp.*,
591 F.2d 195 (2d Cir. 1979).................................................................................................22

*Tas Int'l Travel Serv., Inc. v. Pan Am. World Airways, Inc.*,
96 F.R.D. 205 (S.D.N.Y. 1982) ...........................................................................................19

*Thomas v. City of New York*,
293 F.R.D. 498 (S.D.N.Y. 2013) ...............................................................................17, 18, 20

**Statutes and Rules**

Fed. R. Civ. P. 59(b) ....................................................................................................................16

Fed. R. Civ. P. 60(b) ........................................................................................................ *passim*

Fed R. Evid. 801(d)(1) .................................................................................................................23

Fed. R. Evid. 804(b)(1) ................................................................................................................23

Fed. R. Evid. 901(b)(1) ................................................................................................................17

Fed. R. Evid. 1003 ........................................................................................................................17

Fed. R. Evid. 1008 ........................................................................................................................18

N.Y. Jud. Law § 487 .....................................................................................................................22

Defendant Orly Genger ("Orly") submits this memorandum of law in support of her motion, pursuant to Rule 60(b) (2), (3) and (6) of the Federal Rules of Civil Procedure, to vacate the Amended Judgment entered on March 17, 2015 (the "Judgment") in favor of plaintiff Sagi Genger ("Sagi") on his breach of contract and promissory estoppel claims.[1]

## PRELIMINARY STATEMENT

Newly-discovered evidence has now come to light that Sagi's entire case was a calculated fraud. The centerpiece of his case on his summary judgment motion was a knowingly false and perjurious declaration (the "Parnes Declaration") made by his lawyer and close friend, David Parnes, who was never cross-examined under oath in this action. Using this sworn (but false) declaration, Sagi argued that the writing at the heart of this action – the November 10, 2004 letter in which he claims Orly agreed to indemnify Sagi for one-half of any payments made by him to their mother, Dalia Genger, – was an authentic document, on the basis of which, he argued, this Court can and should grant him summary judgment. It is not. And now, through newly-discovered evidence, Orly can prove it.

After the Judgment was entered, Parnes, who resides in Israel, testified at a court-ordered deposition held in April and May 2015 in New York State Supreme Court in a separate fraud case brought by Orly against Sagi concerning yet another fraudulent agreement that Sagi had created for Orly's signature around the same time as the November 10, 2004 letter at issue in this case. That fraud case, *Genger v. Genger*, Index No. 100697/2008, was tried in the Supreme Court of the State of New York during a three-month bench trial before the Hon. Barbara Jaffe and is pending decision (the "State Fraud Action"). When Sagi testified at that trial, he revealed – for

---

[1]         Submitted herewith in support of this motion is the Declaration of Eric D. Herschmann, dated November 12, 2015 ("Herschmann Decl."). Citations to "Ex. __" are to exhibits to the Herschmann Declaration.

the first time – that Parnes claimed to be acting as the lawyer for both Sagi *and Orly* in 2004.  In light of this eleventh-hour revelation and as a condition to Sagi calling Parnes as his witness at trial, Justice Jaffe ordered that Parnes be deposed in a court-supervised deposition.  The court further ordered that, because Sagi's claim about Parnes had now effected a broad subject-matter waiver of any privilege, documents previously withheld as privileged related to any Genger family businesses had to be produced before his deposition.

Parnes was therefore deposed in New York in a deposition presided over, at Judge Jaffe's appointment, by Special Master Stephen G. Crane -- the former Senior Associate Justice of the Appellate Division and former New York County Chief Administrative Judge -- who attended in person and allowed the deposition to continue for six days due, in part, to Parnes' evasive answers.  After further orders by Judge Crane, Sagi also produced previously withheld documents and emails.  The disclosure of this information revealed further falsehoods by Sagi in obtaining the Judgment.  Moreover, as also outlined below, the newly-discovered evidence reveals egregious misconduct by Sagi and his counsel in connection with, among other things, the preparation and submission to the Court of the Parnes Declaration and the withholding and concealment from Orly, on frivolous privilege grounds, of highly relevant documents.

Most importantly, Parnes' deposition testimony revealed that he cannot authenticate the November 10, 2004 letter (the supposed "Indemnification Letter" or "Letter").  In the Parnes Declaration submitted to Your Honor, he had sworn:  "I picked up the [Letter], which I brought to Sagi.  I watched Sagi sign the letter. . . . I have examined the document [the Letter proffered by Sagi to this Court], and **it is the same document which Orly left for me with her doorman** on or about November 10, 2004, as discussed above."  Parnes Decl. (Ex. 4) ¶¶ 8, 11 (emphasis added).  But in his later testimony, he revealed that was not true:

2

> Q.  When you picked up the document, did you open the envelope?
> A.  I don't think so, **no**.
> Q.  Did you look at it?
> A.  **No**.
> Q.  Did you discuss it with anyone?
> A.  Don't think so, **no**.
> *   *   *
> Q.  When did you see Exhibit B [the Letter] after you picked it up?
> A.  I don't remember.
> Q.  You don't remember when you first saw it?
> A.  No.
> Q.  What did you do with it after you tell us you supposedly picked it up?
> A.  I think I gave it to Sagi.
> Q.  And you didn't open the envelope and see him open it?
> A.  I don't remember, **no**.

Parnes Dep. (Ex. 10) 2037:4-10, 2037:22-2038:12 (emphasis added).

Since neither Parnes nor anyone else witnessed Orly sign the document (and Orly has no memory of it), and he now admits he never saw the Letter after it was supposedly signed by her, he is incompetent to authenticate the copy of the Letter proffered by Sagi in this action.  The Parnes Declaration is further undermined by the now established fact that the Letter Sagi proffered to this Court bears a photocopy of Orly's signature, not the original, which has never been explained.  Since Parnes has now recanted his own declaration about the Letter, the Letter is not admissible evidence, and the Judgment – which is predicated on this document being authentic – must be set aside as having been procured by knowingly false evidence.

Parnes made other admissions under cross-examination that further demonstrate his prior declaration submitted to this Court is a complete fabrication.  Under cross, Parnes testified that he was Orly's attorney in 2004 (*i.e.* at the time the Indemnification Letter was supposedly written and signed); but he never said that in his declaration or offered, either then or now, an explanation of how, consistent with his professional ethical obligations, he could assist Sagi in legal actions against Orly -- someone he claims is a former client.  Also under questioning, Parnes admitted

3

that he had an actual conflict of interest with Orly but that he never once sought a conflict waiver from her or otherwise made his Genger file available to her.  He also was forced to admit that he and Sagi routinely backdated and falsified documents, including promissory notes and agreements during this period in connection with the Genger businesses.  Finally, he admitted that he never searched his records, including computer records, for relevant documents.  Based on these incriminating admissions, Special Master Crane and Justice Jaffe ordered Sagi and Parnes to turn over Parnes' hard drives and to clone them for forensic examination and production in the State Fraud Action.[2]

Because this newly discovered evidence so clearly shows that Parnes lied in his sworn declaration, and that Sagi knowingly offered false testimony, impugning the integrity of our courts, fundamental equity requires that the Judgment be vacated.  Moreover, since Sagi has no legitimate evidence to sustain his complaint, it should be dismissed with prejudice, and plaintiff and his counsel should be sanctioned by awarding attorneys fees and costs to Orly, or, at the very least, the matter now warrants trial.[3]

## RELEVANT FACTS

**A. Sagi's Summary Judgment Motion Relied On
The Authenticity Of The Indemnification Letter**

On his motion papers, Sagi argued that this Court should accept the Letter at face value and rely on it in finding that there was an enforceable agreement or promise by Orly to pay.  But

---

[2]    Orly has not yet received these withheld documents.

[3]    Orly would have brought this motion earlier in time but for Sagi's ill-fated attempt to claw-back, as allegedly privileged, communications between himself, his counsel and Parnes concerning the preparation of the Parnes Declaration, which Sagi for the first time produced in the State Fraud Trial.  Out of an abundance of caution, Orly delayed bringing this motion (and publicly filing the documents) until after Justice Jaffe affirmed Special Master Crane's ruling.  On October 23, 2015, Justice Jaffe issued an order rejecting Sagi's attempt to claw back those documents, Genger v. Genger, No. 100697/2008, Docket No. 766 (Sup. Ct. N.Y. Cnty. Oct. 23, 2015).

this case can no longer be considered a simple breach of contract case since the only evidence to authenticate the Letter, the Parnes Declaration, is now exposed as a falsehood.

### 1. The Disputed Testimony About The Letter

On the summary judgment motion, Sagi argued that the Letter was authentic and that it contained Orly's signature. Ex. 1 ¶ 5. He had no firsthand knowledge that Orly ever received, much less signed, the document, however. *See id.* Orly, on the other hand, argued that she did not recall ever signing the Letter or even seeing it, and had no recollection at all about any indemnification agreement. Ex. 2 ¶¶ 2-3, 9. Orly also demonstrated, and Sagi conceded, that what purports to be her signature on the Letter is a photocopy, not an "original." Ex. 3 ¶ 59.

### 2. Sagi Used The Parnes Declaration To Authenticate The Letter And To Corroborate His Testimony

This he-said/she-said evidentiary stalemate was broken, or so Sagi argued, by the Parnes Declaration, sworn to on May 28, 2014. Ex. 4. In that declaration, Parnes attested (falsely) to have personally seen the "original" Letter with Orly's signature when he picked up the Letter from the doorman at Orly's apartment building after she supposedly signed it. *Id.* ¶ 8.

The Parnes Declaration also purported to corroborate other aspects of Sagi's testimony based on Parnes' own personal knowledge, including that Orly, Sagi and Dalia had agreed in advance of October 30, 2004 that both Sagi and Orly would equally provide Dalia financial support to induce her to transfer her rights to the TRI shares and enter into the divorce stipulation with their father, Arie Genger (*id.* ¶¶ 3-4, 6), and that Orly had orally promised to indemnify Sagi for one half of the payments he made to Dalia pursuant to his so-called "Promise Agreement" embodied in an October 30, 2004 letter from Sagi to Dalia (the "Promise Agreement") (*id.* ¶ 6).

5

Sagi presented no other evidence to corroborate his claim that he had provided the Letter to Orly, that she had agreed to it and signed it, and that she had delivered it back to him. Thus the Parnes Declaration was key. Sagi's counsel (John Dellaportas) emphasized the importance of the Parnes Declaration to Sagi's case. He represented to the Court that Parnes "personally spoke with Orly about her execution of the [Letter] and then picked up her signed copy from her apartment." Ex. 5.

### 3.   The Court's Decision Relied On The Parnes Declaration

In this Court's Opinion & Order, dated January 5, 2015 granting summary judgment in favor of Sagi (the "Decision"), the Court expressly found that, on the record provided by Sagi, there was "no genuine issue of material disputed fact as to the authenticity of the [Letter] or as to whether Orly signed it." Ex. 6 at 5 n. 8. This finding was evidently based on the Parnes Declaration since that declaration was the only (purported) evidence in the record of a first-hand account of how Orly's signature (albeit an unexplained photocopy) was placed on the Letter proffered by Sagi. Based also on that finding of authenticity, the Court similarly granted summary judgment in favor of Sagi on promissory estoppel, ruling, "In the [Letter], Orly made a clear and unambiguous promise to indemnify Sagi." *Id.* at 23. Final Judgment was originally entered on January 6, 2015, and the Judgment, as amended, was entered on March 17, 2015.

## B.   The State Fraud Trial Revealed The Falsity Of The Parnes Declaration

On January 29, 2015, three weeks after the Decision, the trial in the State Fraud Action commenced before Justice Jaffe. At issue in that action was a fabricated "Bill of Sale" that had been created by Sagi and Parnes in late 2004 – around the same time as the Letter at issue here – which Sagi used in defrauding Orly out of her share of family real-estate holdings in Canada.

On the second day of trial, Sagi testified, under cross-examination, that, during this period in 2004 and 2005, his attorney and long-time close friend David Parnes was also *the personal attorney of Orly*. Ex. 8 at 231:18-21. Based on this surprise claim, Justice Jaffe ruled that Sagi had effected a broad subject-matter waiver of privilege and could no longer withhold from Orly any communications concerning the Genger family businesses, and the court, accordingly, ordered their immediate production. Likewise, because Parnes was on Sagi's witness list, the court ordered Parnes to be deposed before appearing at trial and after the previously withheld documents had been produced. *Id.* [1986:15-17; 2923:3-8; 2965:7-10]. The court temporarily suspended the fraud trial and appointed former justice Stephen G. Crane as Special Master to oversee both the deposition and production of the new documents. Ex. 9. Judge Crane personally attended each day of the Parnes deposition, which he permitted to continue over six days, in part because of Parnes' evasive answers and Sagi's failure to timely produce the improperly withheld documents. Ex. 10 at 1186:4-1187:5; *id.* at 1872:14-1900:25; 2085:10-2087:19.[4]

The Parnes deposition and the newly disclosed documents reveal the Parnes Declaration to be a total fraud. But first, Sagi continued to try to evade the state court's orders.

### 1.  <u>Sagi Tried To Suppress Discovery Of The Falsehood</u>

In this action, as in the State Fraud Action, Sagi and Parnes maneuvered to avoid Orly's attempts to obtain discovery from Parnes – even though they later both claimed that Parnes was Orly's own attorney. Parnes, who is a licensed New York attorney and who maintained a New York telephone exchange according to his website, claimed to be beyond the process power of the U.S. courts in New York because he lived in Israel. *See* Ex. 12. He refused to unconditionally

---

[4]   Cited excerpts of the Parnes deposition are attached to the Herschmann Declaration as Exhibit 10. The full transcript of the Parnes deposition is included as Exhibit 11. The evidence of Sagi's fraud in the State Fraud Action is summarized in Orly's post-trial brief in that case, which is included as Exhibit 7.

accept a New York subpoena (federal or state) from Orly, even though he did voluntarily accept one from Sagi in the state action.  Compare *id.* with Ex. 10 at 109:7-110:3.  In fact, Parnes had previously tried to dictate terms for his deposition.  In another litigation, Parnes said that he would cooperate in making himself available to provide deposition testimony to Orly only if the following conditions were satisfied:  (1) Orly paid all costs of the deposition, including, but not limited to, Parnes' attorneys fees; (2) Orly agreed to limit her examination to topics identified by Parnes and (3) Orly waived any potential claims against him.  Ex. 13.  Orly, prudently, did not agree.

Sagi and Parnes continued this pattern of resisting full disclosure in the State Fraud Action, to the point of defiance of court orders.  Thus, in response to the state court's order directing Sagi to produce the withheld documents, Sagi resisted by improperly logging scores of such documents as privileged in spite of the court's prior ruling about the wide scope of subject-matter waiver, forcing Orly to seek *in camera* review of these documents in the middle of the ongoing Parnes deposition.  *See* Ex. 10 at 1872:14-1900:25; 2085:10-2087:19.  Based on his review, Special Master Crane ordered over 70% of the documents on Sagi's log to be produced, often finding that there was no conceivable claim of privilege in the first place.  *Id.*  (His rulings were upheld by Justice Jaffe.  Ex. 14.)[5]  In the end, the Special Master made a specific finding that, despite Justice Jaffe's orders, relevant Parnes documents were still inexplicably missing and that Sagi and Parnes had not made full disclosure:  "I do find however, that documents existed that have not been produced."  Ex. 16.  He also ordered (and Justice Jaffe reviewed and upheld the order) that Parnes and Sagi provide a neutral third party with Parnes' computer hard-drives so

---

[5]     A sampling of documents improperly withheld by Sagi in the State Fraud Action that Special Master Crane ordered to be produced are attached to the Herschmann Declaration as Exhibit 15.

that they can be cloned and forensically searched, and responsive documents produced to Orly. Ex. 17; Ex. 14.

### 2. Parnes' Testimony At His Court-Ordered Deposition Contradicted His Declaration In Material Respects

At his deposition, Parnes was represented by his own counsel and Sagi and his counsel, John Dellaportas, were also present.  Ex. 10 at 2.  Under cross examination at the deposition, Parnes admitted that he had no personal knowledge at all pertaining to the Letter and that, consequently, the Parnes Declaration submitted to Your Honor is knowingly false and misleading. Contrary to the Parnes Declaration, Parnes has now admitted that (i) he had no first-hand knowledge of any discussion between Orly, Dalia and Sagi in which Orly supposedly agreed verbally to provide financial support to Dalia in order to induce her to sign the Divorce Stipulation (Ex. 10 at 2057:17-2058:11-13; 2053:11-2054:11); (ii) he had no first-hand knowledge of whether the Letter was ever delivered to Orly to be signed (*id. at* 2028:8-9, 2030:22-2031:1); (iii) he did not witness Orly sign the Letter or any other document (*id.* at 2031:2-19, 2037:1-3); and (iv) he did not know whether the envelope he testified he picked up at Orly's apartment building was, in fact, the Letter or whether it was signed or not (*id.* at 2037:4-14).  On these topics, the stark contradictions, in Parnes' own words, are as follows:

| Parnes Declaration | Parnes Deposition |
|---|---|
| "In late 2004, a deal was negotiated where Dalia agreed to convey her marital rights to 794.40 shares of TRI to two trusts for the benefit of Sagi and Orly, respectively, in exchange for which Sagi and Orly orally agreed to give their mother a clawback right to her for living expenses, should those TRI shares ultimately produce | "Q.  Were you ever present in which Orly Genger orally agreed to give her mother a claw-back right related to her living expenses? A. I do not remember. Q.  Sir, you signed a declaration less than a year ago in which you made the representation.  Were you present at any point where you heard Orly Genger supposedly make this representation to her |

| **Parnes Declaration** | **Parnes Deposition** |
|---|---|
| economic value." <br><br> **Parnes Decl. (Ex. 4) ¶ 3** | mother? <br> A:  I don't remember being present.  I don't remember a conversation between the three of them when I was present about this. <br> Q.     Sir, were you ever present in a conversation between Dalia and Orly in which Orly agreed to give her mother a claw-back right for living expenses? <br> A.     It's the same question.  I don't remember." <br> **Parnes Dep. (Ex. 10) 2053:7-2054:11** <br><br> "Q.  Did you ever send an email to either Arie's attorneys or Dalia's attorneys to say Orly Genger has agreed to a claw-back right for Dalia?  Yes or no? <br> A.        No." <br> **Parnes Dep. (Ex. 10) 2062:20-24** |
| "Before signing the letter with his mother, on October 30th, while at the closing, Sagi confirmed with Orly her agreement to the clawback." <br><br> **Parnes Decl. (Ex. 4) ¶ 7** | "Q.     Were you sitting in a room with Orly, Sagi and Dalia discussing the divorce agreement? <br> A.     No. <br> Q.     Were you ever present with Orly, Sagi and Dalia discussing this concern that Dalia had? <br> A.     No." <br> **Parnes Dep. (Ex. 10) 2013:6-13** <br><br> "Q.     Sir, I want you to focus on your firsthand knowledge. <br> A.     Yes. <br> Q.     Did you ever, and I mean literally ever, sit in a room with Orly Genger, Dalia Genger and Sagi Genger and talk about things that should be done to induce Dalia to sign? <br> A.     I don't remember such conversations. <br> Q.     Did you ever sit in a meeting with Arie Genger, Dalia Genger, Sagi Genger and Orly Genger and discuss what things needed to be done to induce Dalia to sign? <br> A.     No. <br> Q.     Did you ever witness Orly Genger sign any documents related to this supposed |

10

| **Parnes Declaration** | **Parnes Deposition** |
|---|---|
| | promise?  Yes or no, sir?<br>A.    I don't remember witnessing her, no."<br>**Parnes Dep. (Ex. 10) 2013:24-2014:17** |
| "When Orly returned to New York in November 10, Sagi sent Orly the November 10, 2004 letter."<br><br>**Parnes Decl. (Ex. 4) ¶ 8** | "Q.  How did this letter that you say Orly Genger signed get to her apartment?<br>A. I don't know.<br>Q. Did you bring it?<br>A. I don't remember bringing it.<br>Q. Well, you told us you believe you walked it over.<br>A. Picking it up I think I did.<br>Q. Did you drop it off?<br>A. I don't remember dropping it off.<br>Q. Do you know what was dropped off?<br>A. No."<br>**Parnes Dep. (Ex. 10) 2027:23-2028:9**<br><br>"Q. So you have no idea what was supposedly dropped off at her apartment to be signed, right?  Because you weren't there?<br>A. Yes."<br>**Parnes Dep. (Ex. 10) 2030:22-2031:1**<br><br>"Q. Did you give [Orly] legal advice about the potential ramifications, if she supposedly had signed it?<br>A.  I did not know the content beforehand, no.<br>Q. You didn't know the content of the letter beforehand, right?<br>A. Right, right."<br>**Parnes Dep. (Ex. 10) 2035:23-2036:5** |
| "She later called me back and told me that she was leaving the signed copy with the doorman at her New York City apartment building.  I picked up the copy, which I brought to Sagi.  I watched Sagi sign the letter."<br><br>**Parnes Decl. (Ex. 4) ¶ 8** | "Q. You didn't see [Orly] sign anything, right?<br>A. No.<br>Q. So you never saw her sign what is attached to your declaration as Exhibit B, right?<br>A. Her signing?<br>Q. Yes.<br>A. No."<br>**Parnes Dep. (Ex. 10) 2031:2-19** |

11

| Parnes Declaration | Parnes Deposition |
|---|---|
| "I understand that Orly maintains that Exhibit "B" is a forgery.  I have examined the document, and it is the same document which Orly left for me with her doorman on or about November 10, 2004, as discussed above."<br><br>**Parnes Decl. (Ex. 4) ¶ 11** | "Q. When you picked up the document, did you open the envelope?<br>A. I don't think so, no.<br>Q.  Did you look at it?<br>A. No.<br>Q. Did you discuss it with anyone?<br>A. Don't think so, no."<br>**Parnes Dep. (Ex. 10) 2037:4-10**<br><br>Q. When did you see Exhibit B after you picked it up?<br>A. I don't remember.<br>Q. You don't remember when you first saw it?<br>A. No.<br>Q. What did you do with it after tell us you supposedly picked it up?<br>A. I think I gave it to Sagi.<br>Q. And you didn't open the envelope and see him open it?<br>A. I don't remember, no."<br>**Parnes Dep. (Ex. 10) 2037:22-2038:12** |

Parnes' deposition testimony also flatly contradicts Dellaportas' bolstering mis-representation to this Court that David Parnes "personally spoke with Orly about her execution of the [Letter] and then picked up her signed copy from her apartment."  Ex. 5.

Moreover, the Parnes Declaration is all the more suspect in light of Parnes' (and Sagi's) new testimony that Parnes was (at least in his own mind) Orly's own attorney at the time.  Ex. 10 at 1982:20-1983:21.  He never made such a claim in his declaration or at any other time during the many years of litigation between Sagi and Orly, which makes it inherently suspect.  It also underscores the absurdity of his claim that it was he – an attorney who was in the midst of moving his entire family overseas to Israel – who supposedly took the time to act as an errand-boy to travel to Orly's New York apartment building to pick up a package from a doorman and,

supposedly, to deliver it to Sagi.  Moreover, he now claims he did all that while he was supposedly *Orly's attorney*, with fiduciary duties of loyalty to her.  Yet, he stated in his deposition testimony that he supposedly participated in obtaining the signature of someone he believed was his client on a legal document without ever discussing it with her, which is unethical to the point of legal malpractice and is inherently suspect and not credible.  *Id.* at 2035:19-2036:5; 2039:19-2040:20.  Parnes admitted to other highly unethical, if not illegal conduct, including, for example, submitting recent affirmations in New York legal proceedings holding himself out as a practicing New York attorney even though he had certified to the New York bar that he had permanently retired from the practice of law in 2011.  In light of this testimony, Judge Crane – who, among other roles, previously served as the Senior Associate Justice of the New York State Appellate Division, Second Department – advised Parnes of his Fifth Amendment right against self-incrimination.  Ex. 10 at 277:7- 278:10; 280:18-282:18.

### 3.   Newly Discovered Parnes Documents Undermine The Integrity And Fairness Of The Final Judgment

In addition to his new admissions at his deposition, documents of Parnes' communications with Sagi and Sagi's lawyer Dellaportas further undermine the Parnes Declaration.  For example, Dellaportas told Parnes to attest to the building address where he supposedly picked up the Letter, even though Parnes did not know the address or location.  Ex. 18 at 2-3.  In the same exchange, Sagi told Parnes to leave out any reference to Ed Klimerman (an attorney representing Orly's father during the divorce and who Sagi claims drafted the Letter), because, as Sagi put it to the group: "who knows what Klimerman [will] say."  *Id.* at 1.  Dellaportas also further coached Parnes to draft his declaration in a manner to try to create immunity from service of process or subpoena so his statements could not be tested.  *Id.* at 2 ("[W]e should include the office address

for your current law practice, to make clear that you are now a resident of Tel Aviv, since they are always trying to subpoena you here.")  A newly-revealed Parnes email also revealed that, even though no original of the Letter was ever produced in this action, Parnes told Sagi that he supposedly had the "original" in Israel and had arranged to send it to Dellaportas.  Ex. 24.

Also during the trial in the State Fraud Action, Parnes and Sagi produced for the first time a diary that Parnes claimed reflected his legal work on Genger-related matters in 2004.  In attempting to explain why this had never been previously produced, Parnes claimed that he discarded all of his diaries, including diaries from just last year (Ex. 10 at 622:5-623:10), and that his mother had just happened to have found this one while cleaning her Tel Aviv home and that this discovery coincidentally happened to have been made right when Sagi was being questioned at trial about the lack of documents showing that Parnes had done any actual legal work to merit being paid by the Genger business entities.  Ex.10 at 331:1-11.[6]

Finally, Orly discovered at the trial in the State Fraud Action that Parnes was intimately involved in the Canadian real-estate fraud perpetrated by Sagi against Orly, and that he personally benefitted to the tune of hundreds of thousands of dollars at Orly's expense.  In this context, Parnes admitted under questioning that he had an actual conflict of interest with Orly with respect to some of these transactions, but that he never even thought of obtaining a conflict waiver from her.  Ex. 10 at 1657:21-1658:10; 1661:13 – 1662:23.  Specifically, the evidence adduced at trial established that, after Parnes assisted Sagi in seizing control of TPR following the Genger divorce, Sagi rewarded Parnes by naming him "vice president" of that company.  *Id.* at 237:21-23,

---

[6]    It was also revealed at the trial in the State Fraud Action that Dellaportas had received the diary weeks before it was disclosed to Orly during trial and that Dellaportas had intentionally misled the court.  Ex. 8 at 1980:18-24.  This misconduct by counsel, moreover, was not an isolated event.  It was compiled with other misrepresentations showing a pattern of misconduct and is part of the basis for Orly's motion for sanctions against Sagi and his counsel pending before Justice Jaffe.  Ex. 8 at 3407:19-24; Ex. 19.

486:17-23.  During that time, Parnes assisted Sagi in drafting various agreements pursuant to which Sagi illegally transferred millions of dollars from entities in which Orly owned a stake to (at times, off-shore) entities benefitting only Sagi, which he created as a part of a tax-avoidance scheme.  Ex. 20; Ex. 8 at 1489:2-1490:4, 1614:22-1616:7; Ex. 10 at 1160:2-1161:14; Ex. 21.  All of this moreover, occurred during a time (in 2004) when Parnes claimed, incredibly, to have simultaneously represented not just Orly and Sagi while they were on opposing sides of these "transactions," but also both of their parents (Arie and Dalia) while they were going through their divorce.  Ex. 10 at 169:6-170:7.  And he has not a single document or notation anywhere – no retainer agreements, no time entries, no invoices – to support this facially incredible claim, and, of course, no written conflicts waiver from any of the Gengers.  Ex. 10 at 121:11-124:12.

Importantly, the evidence elicited at trial from Sagi and Parnes revealed that, during the very same time period in which Sagi claims the Indemnification Letter came about, Sagi and Parnes created falsified and back-dated agreements in order to paper over their efforts to misappropriate funds from various Genger family entities at Orly's expense.  For instance, to create a false paper trail and award himself "consulting fees," Sagi, without Orly's knowledge or consent, directed Parnes to draft "consulting agreements" backdated to November 1, 2002, which he and Parnes signed on behalf of the entities involved.  Ex. 21; *see also* Ex. 10 at 1255:9-1256:5, 1257:18-1258:1 ("Q: Do you recall creating various consulting agreements all around the same time?  A: Yes").  Under the agreement backdated to 2002 – but actually created at Sagi's direction years later – an entity, in which both Sagi and Orly owned equal shares, had a contingent obligation to pay Sagi another $200,000 bonus if the properties sold within six years of 2002.  That, however, was not a real contingency because the buildings had already sold when the backdated agreement was created by Sagi and Parnes after the fact in 2005.  With this sham

15

"contingent" bonus, the total amount in fees that these agreements obligated the Genger entity at issue to pay Sagi was $1.8 million.  Ex. 21; Ex. 10 at 1273:4-1275 ("Q. When this document was signed by you and Sagi Genger, it was already guaranteed that the contingencies had been met because the buildings were [already] sold, right?  A. It seems so, yes.").

## ARGUMENT

Pursuant to Rule 60(b), a district court may "relieve a party" from a final judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; fraud, misrepresentation, or misconduct by an opposing party; or "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(2), (3) and (6); *Kearsey v. Williams*, No. 99 CIV. 8646 (DAB), 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004) (citing *United States v. Bank of New York*, 14 F.3d 756, 758 (2d Cir.1994)).  *See also Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986).

Where, as here, a judgment is tainted because it is based on false evidence tendered by the prevailing party, courts have not hesitated to vacate it pursuant to Rule 60(b), which is designed to temper the judiciary's interest in preserving the finality of judgments with the paramount interest in serving the ends of justice and protect the integrity of legal proceedings.  *E.g.*, *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 286 F. Supp. 2d 309, 312 (S.D.N.Y. 2003) (McMahon, J.)

## I.     THE JUDGMENT SHOULD BE VACATED BECAUSE SAGI KNOWINGLY PRESENTED FALSE EVIDENCE

Parnes' recent sworn testimony constitutes clear and convincing evidence that the Parnes Declaration – drafted and used by Sagi to obtain the Judgment – is materially false.  This

"exceptional circumstance" justifies vacating the Judgment under Rule 60(b)(3) to protect the
integrity of our courts.  *See Catskill*, 286 F. Supp.2d at 312-13 (describing standard).

There is no question that Sagi's use of the false Parnes Declaration substantially interfered
with the fair adjudication of this case.  *Thomas v. City of New York*, 293 F.R.D. 498, 504
(S.D.N.Y. 2013) (where falsehood is intentional movant is "entitled to presumption that the
misconduct substantially interfered with [her] preparation of [her] case").

Once the Parnes Declaration is discounted, there is no evidence to authenticate the
Indemnification Letter offered by Sagi.  *See* Fed. R. Evid. 901(b)(1) (authentication by testimony
of witness with knowledge).  For that reason, the Letter, which as even Sagi admits bears only a
photocopy of Orly's signature, would be inadmissible under the Best Evidence Rule, precisely
because no witness can attest that this copy is a complete and accurate copy of the missing
original.  Fed. R. Evid. 1003 ("A duplicate is admissible to the same extent as the original unless
a genuine question is raised about the original's authenticity or the circumstances make it unfair
to admit the duplicate."); *Carroll v. LeBoeuf, Lamb, Greene & MacRae, L.L.P.*, 614 F. Supp. 2d
481, 484-485 (S.D.N.Y. 2009) (Kaplan, J.) ("testimony that [movant] did not write the letters, that
the signatures on them are not his, and that other circumstances relating to the content of the
copies suggest that either the originals or the copies are forgeries raises genuine questions as to
the authenticity of both"); *see, e.g.*, *Pro Bono Investments, Inc. v. Gerry*, No. 03-cv-4347 (JGK),
2005 WL 2429777, at *4-5 (S.D.N.Y. Sept. 30, 2005) (where evidence raised "serious questions
as to the authenticity of the alleged original" of the agreement, including evidence that suggested
one party "may not have signed" the agreement and that the agreement was "never mentioned" to
anyone, court concluded that, pursuant to Fed. R. Evid. 1008, only jury is able to decide whether
the copy is accurate and reliable); *Abildgaard v. Brulle*, 2014 WL 5801837, at *4-12 (Civ. Ct.

17

N.Y. Cty. Nov. 6, 2014) (proffered signed agreement barred by best evidence rule because it was central to the plaintiff's case and plaintiff failed to explain absence of original).

In the absence of the Sagi-proffered Letter, only a fact finder making credibility determinations on a full record would be equipped to resolve the central question as to whether Orly ever agreed or promised to indemnify Sagi with respect to his Promise Agreement to his mother. By foreclosing a plenary trial, the use of the knowingly false Parnes Declaration prevented Orly from having her opportunity to "fully and fairly" present her case. *See Thomas*, 293 F.R.D. at 504 (no need to show that outcome would have been different absent misconduct, but only that such misconduct "precluded inquiry into a plausible theory of liability [or defense], denied [movant] access to evidence that could well have been probative on an important issue, or closed off a fruitful avenue of direct or cross examination'") (citing *Catskill*, 286 F. Supp. 2d at 316; quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988)).

Moreover, in addition to using the false Parnes Declaration, the other misconduct of Sagi and his counsel in this action constitutes additional, independent grounds for vacating the Judgment. Among other egregious conduct catalogued above, Sagi and his lawyers calculatingly tried to suppress discovery of the truth about Parnes' complicity in Sagi's wrongdoing by coaching him to avoid the jurisdiction and to conceal and suppress documents, while failing to produce their own complete record of communications with Parnes about Orly and the issues in dispute in this case. *See Thomas,* 293 F.R.D. at 503 (the "scope of 'misconduct,'" as that term is used in this rule, "certainly envisions a wider scope than fraud or misrepresentation lest it be redundant" and such misconduct "need not be nefarious to warrant action under Rule 60(b)(3)"), citing *Anderson*, 862 F.2d at 923.

18

In other cases where a critical witness was shown to have recanted testimony or otherwise to have provided false evidence, federal courts have not hesitated to vacate the judgment under Rule 60(b)(3), especially where, like here, the falsity was brought to the court's attention immediately and no later than a year after entry of judgment.  In *Tas Int'l Travel Serv., Inc. v. Pan Am. World Airways, Inc.*, the Court vacated the judgment based on a jury verdict against Pan Am Airways after a full trial based on post-trial evidence of perjured witness testimony:

> When a final judgment is attacked on grounds that it was procured by false testimony, the court must balance competing concerns for the fairness and integrity of judicial determinations, on the one hand, and the policy favoring finality in litigation on the other.  In cases where the motion has been brought within one year of judgment as required by Rule 60(b)(3), the better course is to resolve this conflict in favor of assuring the fairness and integrity of judgments, at least to the extent of requiring a hearing when an adequate threshold showing of false testimony by a party witness has been made.

*Tas Int'l Travel Serv., Inc. v. Pan Am. World Airways, Inc.*, 96 F.R.D. 205, 208 (S.D.N.Y. 1982).

Similarly, in *DiPirro v. U.S.*, the district court vacated a final judgment after trial because subsequent testimony by the plaintiff in a different case showed that she had worked during a particular time frame, which contradicted her critical testimony in the first case that she was totally disabled and unable to work during that time.  189 F.R.D. 60, 66 (W.D.N.Y. 1999).  Such clearly conflicting testimony constituted "clear and convincing proof of a misrepresentation, intentional or not, material to the court's determination" sufficient to warrant vacating the judgment.  *Id.; see also Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995) (based on evidence that defendant had submitted a falsified document into evidence, the Circuit Court of Appeals reversed district court's denial of motion and vacated judgment because "Rule 60(b)(3) protects the fairness of the proceedings, not necessarily the correctness of the verdict"), cited in *Zarelli v. N.Y.C. Board of Education*, No. 99-7016, 199 F.3d 1325 (2d Cir. Oct. 20, 1999).

19

Sagi and Parnes' creation and proffer of knowingly false evidence constituted substantial interference precisely because, just as in *Thomas v. City of New York*, "credibility was the very heart of this case" as "[t]here were no hard facts" and "it was precisely [one witness]'s credibility as a witness and [plaintiff]'s credibility as a witness and litigant" that need to be weighed by the fact finder to resolve the parties' dispute. 293 F.R.D. at 507. Given the inherent unfairness in Sagi's use of such false evidence and the Court's overarching interest in protecting its own integrity, the Judgment should be vacated as having been "unfairly procured." *Id.* (quoting *Anderson*, 862 F.2d at 924 n. 10); *Catskill*, 286 F. Supp. 2d at 316 (pursuant to Rule 60(b)(3) movant only required to show inability to fully and fairly present its case, not that outcome would have been different absent the misconduct); *see* Fed. R. Civ. P 60(b)(6).

## II.   NEWLY DISCOVERED EVIDENCE FURTHER <u>WARRANTS RELIEF FROM THE JUDGMENT</u>

Relief is also warranted under Rule 60(b)(2). Each of the elements of that rule are also met here: (1) "the newly discovered evidence was of facts that existed at the time of trial"; (2) Orly was "justifiably ignorant of them despite due diligence" precisely because Sagi and his counsel concealed the true facts and, in any event, the new evidence is needed to prevent a miscarriage of justice; and (3) the new evidence is clearly "admissible and of such importance that it probably would have changed the outcome." *In re Puda Coal Sec., Inc. Litig.*, No. 11 Civ. 2598 (KBF), 2014 WL 715127, at *2 (S.D.N.Y. Feb. 21, 2014) (Forrest, J.); *see also Ope Shipping, Ltd. v. Underwriters at Lloyds*, 100 F.R.D. 428, 431-32 (S.D.N.Y. 1983) (describing "miscarriage of justice" exception).

1.   Newly Discovered. Of course Parnes' new, contradictory testimony pertains to the state of affairs that existed, not only at the time of the summary judgment motion in 2014, but

also at the time in question (fall of 2004).  The case law is clear that new testimony by a witness

recanting or contradicting prior trial testimony constitutes newly discovered evidence.  *See, e.g.*,

*Berry v. Dep't of Corrections*, No. 93 Civ. 6448 (BSJ), 2004 WL 287666, at * 3 (S.D.N.Y. Feb.

11, 2004).

        2.        Justifiable Ignorance/Prevention of Miscarriage of Justice**.**  Nor is there any

realistic basis to blame the false Parnes Declaration (or the failure to unmask it earlier) on Orly.

She exercised proper due diligence when she made discovery demands in this case calling for the

production of the Parnes documents.  *See* Ex. 22.  The only reason those documents were not

produced is Sagi failed to produce them – even though he revealed only months later in the State

Fraud Action that both he and Parnes regard Parnes as Orly's own lawyer during the relevant time

and thus he had to know he had no valid basis to withhold from Orly relevant Parnes documents

from that time frame.  Because the Parnes documents lay within the exclusive knowledge and

possession of Sagi (and his agent Parnes), there simply is nothing more Orly could have done to

obtain such evidence.  *See Kurzweil v. Philip Morris Co., Inc.*, No. 94-Civ-2373 (MBM), 1997

WL 167043, at * 4 (S.D.N.Y. Apr. 9, 1997) ("plaintiffs have demonstrated due diligence and that

the new evidence likely could not have been presented before the order was entered" where "it lay

within the knowledge, possession and access of defendants").

        With respect to the deposition testimony of Parnes, Orly not only attempted service of a

subpoena on Parnes, but moved to compel his appearance for deposition.  *See* Ex. 12.  However,

Parnes effectively evaded deposition by agreeing to appear only on the condition that Orly waive

any claims she may have against him – a completely unreasonable condition in light of the later

revelations at the trial in the State Fraud Action.  (Orly has a viable claim for treble damages

against Parnes pursuant to Section 487 of the Judiciary Law, which prohibits deceit by an attorney.  N.Y. Judiciary Law § 487.)

In any event, the "justifiable ignorance" requirement under subsection 2 is excused where, as here, the newly discovered evidence is necessary to prevent a miscarriage of justice.  *Berry*, 2004 WL 287666, at *3-4, citing *Ope Shipping*, 100 F.R.D. at 431-32.  *See also Samuels v. Health & Hosp. Corp.*, 591 F.2d 195, 199 (2d Cir. 1979).  This is particularly true where, as here, the opposing party not only knew of such evidence, but actively sought to suppress it.  *Ope Shipping*, 100 F.R.D. at 431-34 (ordering new trial "even in the absence of a showing of 'due diligence'" given "the great likelihood" that the opposing party concealed that evidence and "[s]uch a proceeding would be warranted in order to prevent a miscarriage of justice").

In the oft-cited decision in *Berry*, for example, the district court granted a new trial even though the plaintiff very well might have been able to expose the lies of the defense witnesses had plaintiff exhaustively pursued opportunities to take their depositions.  Applying the "miscarriage" exception, the court held that "denying Plaintiff the opportunity to present his newly discovered evidence at another trial would result in a grave miscarriage of justice" precisely because "the newly discovered evidence submitted by Plaintiff casts serious doubts on the credibility of the testimony presented by Defendants at the trial" and the "court [had] credited and heavily relied on that testimony in making its final determination."  *Berry*, 2004 WL 287666 at *4.

3.      Admissibility and Materiality**.**  The last element of this rule is also met on the facts presented here.  Parnes' deposition testimony is admissible evidence.  Sagi's lawyer was present during the entire deposition, which included six days of sworn testimony presided over by Judge Crane over the course of several weeks; he interposed objections that were ruled on by Judge Crane, and he himself "redirected" Parnes before the deposition closed.  Pursuant to the hearsay

22

exceptions of Evidence Rule 804(b)(1), the transcript itself is admissible even if Parnes were unavailable to testify at the new trial, and Rule 801(d)(1) permits use of the prior testimony in the event Parnes appears at the new trial and makes an inconsistent statement. *Berry*, 2004 WL 287666 at *5; *Kurzweil*, *supra,* 1997 WL 167043, at *5 (the newly proffered testimony is "relevant and not hearsay").

Nor can the materiality of his testimony be reasonably disputed. The fact that he so starkly contradicted the material claims in the Parnes Declaration about the Letter would have undoubtedly led to a different result here. In fact, there is no way, once the Parnes Declaration is excluded, to authenticate the Letter, which is now inadmissible under the best evidence rule. For that reason, the parties' competing claims cannot be resolved on a paper record and a full trial, including credibility determinations of the parties and supporting witnesses, is needed to resolve this case. That sufficiently shows that the outcome likely will be different upon reconsideration, since, upon vacating the Judgment, a summary disposition in Sagi's favor is no longer viable. Given the now-proven mendacity of Sagi and his lawyer Parnes, Sagi cannot prevail upon a plenary trial where his utter lack of credibility will doom his case. *See, e.g.*, *Mayimba Music, Inc. v. Sony Corp. of Am.*, 12 CIV. 1094 AKH, 2015 WL 6917260, at *5 (S.D.N.Y. Apr. 30, 2015) and *Id.* Case Docket No. 195 (S.D.N.Y. Aug. 18, 2014) (attached as Ex. 26) (as defendant music studio offered newly-discovered evidence that showed that the plaintiff had "fabricate[d]" evidence, the court suspended its finding of liability, ordered an evidentiary hearing, rendered supplemental findings of fact findings, and entered judgment in favor of the defendants).

In fact, even were it a "close call" as to the impact Parnes' new testimony would have, that is still sufficient to grant this motion to vacate the Judgment under Rule 60(b)(2). *Gemveto Jewelry Co., Inc. v. Jeff Cooper, Inc.*, 613 F. Supp. 1052, 1059 (S.D.N.Y. 1985) (granting Rule

23

60(b)(2) motion where "whether or not the proffered evidence would produce a different result upon a new trial . . . is a close question"). Such critical and case-altering testimony can never be dismissed as cumulative or merely impeaching. *See id.*; *Berry*, 2004 WL 287666 at *6.

But this case is not a close call. The new evidence of Parnes' self-contradictions and intentional falsehoods is entirely consistent with Orly's defense in this case. To take just one example, Orly has consistently argued that the terms in the Indemnification Letter are irrational and inconsistent with the broader terms of the Arie-Dalia divorce agreement, with which Sagi argues the Letter is integrated. Viewed in the new light that the Letter was proffered based on fraudulent testimony by Parnes, it is clear that, as Orly has always contended, no rational person in her position would have signed the Letter. This is all the more so because that Letter purports to obligate Orly to pay every time that Dalia, at her "sole discretion," demands funds up to an unspecified "value" that Orly supposedly received from proceeds paid to her trust from the sale of the TRI shares. As other evidence shows, to the extent any Dalia "clawback" had actually been part of the discussion of the divorce negotiations prior to its rejection, the clawback always included safeguards (such as agreement of the trustees and agreement by Orly as to the value of the shares being conveyed) – which safeguards are inexplicably absent from the Letter. Compare Ex. 23 at p. 13 § (iii) with Ex. 4 at Exhibit B.

More importantly, as other evidence shows, Orly never received any amount for the TRI shares that were transferred as a result of the divorce stipulation – in stark contrast to Sagi's false claim that she received $32 million. The reality is that, based on the false record presented by Sagi, the Letter – were it accepted as binding – condemns Orly to repaying "TRI funds" to her mother up into the tens of millions of dollars when Orly never received a dime for the TRI shares.

24

Finally, given the definitive proof of the intentional wrongdoing by Sagi and his lawyers (both Parnes and Dellaportas), the only fair inference to be drawn from the facts as they now stand corrected is that Sagi has no legitimate evidence to prove his case (hence his deceit and attempt to procure judgment by fraud).  Accordingly, either summary judgment should be entered in favor of Orly, or Sagi's pleading should be dismissed with prejudice as a sanction for his use of deceit to undermine the integrity of this Court.  At the very least, Orly is entitled to a new trial, and in all events, attorneys fees and costs should be awarded to defendant (which, if sanctions are not awarded *sua sponte*, defendant will seek by subsequent motion).

## **CONCLUSION**

For the foregoing reasons, Orly respectfully requests that the Court enter an Order granting her motion for relief from the Judgment, and granting such further relief as the Court deems just and proper.

Dated:  New York, New York
        November 12, 2015                  KASOWITZ, BENSON, TORRES &
                                    FRIEDMAN LLP

                          By: /s/ Eric D. Herschmann
                             Eric D. Herschmann
                             (eherschmann@kasowitz.com)
                             Daniel R. Benson
                             (dbenson@kasowitz.com)
                             Sarmad M. Khojasteh
                             (skhojasteh@kasowitz.com)
                        1633 Broadway
                        New York, NY  10019
                        (212) 506-1700

                        *Attorneys for Defendant Orly Genger*

25